**SCOTT BADER, INC., Amy C. Wright, Kern & Wooley, L.L.P., and National Pigments & Chemicals, Inc., Appellants**

v.

**SANDSTONE PRODUCTS, INC., Appellee.**

**Scott Bader, Inc. and National Pigments & Chemicals, Inc., Appellants**

v.

**Sandstone Products, Inc., Appellee.**

**Nos. 01–05–00940–CV, 01–06–00593–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 28, 2008.

G. Don Swaim, Kern & Wooley, Irving, Kevin H. Dubose, Alexander Dubose Jones & Townsend LLP, Houston, TX, for Appellants.

Allison Baker Waters, J. Mark Brewer, John Withers Clay, Brewer & Pritchard, P.C., Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, KEYES, and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

■ These two appeals arise from a product liability suit brought by appellee, Sandstone Products, Inc. ("Sandstone"), against appellants, Scott Bader, Inc. ("Scott Bader") and National Pigments & Chemicals, Inc.[1] In appellate cause number 01–05–00940–CV, Scott Bader and its trial counsel, Amy C. Wright, and Wright's law firm, Kern & Wooley, L.L.P., appeal sanctions assessed against them. The trial court awarded sanctions against Scott Bader for abusing the discovery process and against Wright and her firm for violating an in limine order during trial. Scott Bader contends that it did not abuse the discovery process and that the sanctions were not otherwise "just." Wright and her firm challenge the sanctions award against them by asserting that the sanctions were excessive.[2]

In appellate cause number 01–06–00593–CV, Scott Bader and National Pigments challenge the trial court's judgment rendered against them in favor of Sandstone. Presenting four issues and numerous subissues, Scott Bader contends that (1) the testimony of Sandstone's causation expert was unreliable and constituted no evidence of causation, (2) the evidence was legally insufficient to support the damages awarded by the jury, (3) the trial court erred when it included a "binding instruction" in the jury charge that Scott Bader had breached its contract and breached its warranty with Sandstone, and (4) alternatively, the trial court's judgment should be modified because it awarded prejudgment interest on future damages.

In appellate cause number 01–05–00940–CV, we affirm, in part, and reverse and

1. Because these appeals arise from the same underlying litigation between the same parties and because the issues are interrelated, we take judicial notice in each appeal of the record in the other appeal. *Douglas v. American Title Co.* 196 S.W.3d 876, 878 n. 1 (Tex. App.-Houston [1st Dist.] 2006, no pet.) ("We may take judicial notice of our own records between the same parties involving the same subject matter.").

2. The trial court signed an order severing the sanctions orders from the remainder of the case. The trial court then signed a final judgment in the severed cause incorporating the sanction orders, thereby making the sanction orders final for purposes of this appeal.

remand, in part. In appellate cause number 01–06–00593–CV, we reverse the judgment and remand.

### Factual and Procedural Background

Scott Bader is a United States company and a wholly-owned subsidiary of a British company. Scott Bader sells a resin, known as Texigel, which is used as a component ingredient in roof coatings. Although its British parent company manufactures the resins it sells, Scott Bader does not manufacture Texigel, rather, it contracts with "toll" or sub-manufacturers to make the product. Goodrich Corporation ("Goodrich") was Scott Bader's toll manufacturer until 1999. At that point, Para–Chem Southern, Inc. ("Para–Chem") began to manufacturer Texigel for Scott Bader.

Sandstone manufactures and sells roof sealant coatings. From 1994 until 2002, Sandstone purchased Texigel from Scott Bader to use in manufacturing its roof coating.[3] Texigel was the component ingredient in Sandstone's roof coating that caused the roof coating to "bind" or adhere to roofs. Scott Bader provided a formula to Sandstone instructing it how to mix Texigel with nine other ingredients to make Sandstone's roof coating.

In 1999, Sandstone began receiving customer complaints that its roof coating was failing. Specifically, Sandstone's roof coating was swelling with water and not adhering to the roofs to which it had been applied. Sandstone contacted Scott Bader about the problems. Initially, Scott Bader attributed the problems to improper application of the roof coating. As more complaints arose, Scott Bader worked with Sandstone to modify the formula used to make Sandstone's roof coating. The modified formulas continued to include varying amounts of Texigel. Despite the modifications, Sandstone's roof coating continued to fail. Sandstone worked with its customers by supplying new roof coating materials and, in some instances, labor. However, the roof coatings continued to fail.

During the same time frame, Sandstone sought to meet an industry standard for roof coatings. The State of Florida required roof coatings to meet this standard. As a result, Sandstone could not sell its product in Florida until its coating passed the industry-standard test (referred to as the "Dade County Test"). Sandstone submitted its roof coating for testing on three separate occasions, but its product never passed the test. On each occasion, Sandstone's product failed the Dade County Test's "water swell" requirements.

Sandstone ultimately attributed the failure of its roof coating to Texigel. Scott Bader denied that claim, contending that Sandstone was mixing the roof coating improperly. Sandstone sued Scott Bader asserting claims for breach of contract, breach of warranty, violations of the Texas Deceptive Trade Practices Act ("DTPA"), fraud, and negligent misrepresentation. Sandstone also sued NPCI, Para–Chem, and Goodrich.

During the course of the litigation, Sandstone alleged that Scott Bader had made a number of misrepresentations:

- Scott Bader misrepresented that Texigel was water resistant and could be used as an adhesive in roof coatings. It is undisputed that Texigel is a styrene acrylic resin not a pure acrylic

---

3. Appellant, National Pigment & Chemicals, Inc. ("NPCI"), is the distributor for Scott Bader's product from whom Sandstone purchased the resin. NPCI and Scott Bader are closely aligned in this case. The trial court instructed the jury that NPCI acted as an agent for Scott Bader and that Scott Bader was legally responsible for NPCI's conduct. Thus, we refer to Scott Bader and NPCI collectively as "Scott Bader."

resin. Styrene acrylic contains the compound acrylamide, a water *absorbent* material, not a water *resistant* material. As such, Sandstone contended that Texigel was unsuitable for use in commercial roof sealant coatings, such as those manufactured by Sandstone.

- Scott Bader misrepresented that it manufactured Texigel, when in fact it was manufactured by toll manufactures Goodrich and Para–Chem.
- Scott Bader misrepresented that Texigel could be used to pass the Dade County Test. Sandstone contended that an acrylamide resin could never pass the test; rather, only pure acrylic resins can meet the standard.
- Scott Bader misrepresented that Texigel contained the same ingredients as the resin manufactured by Scott Bader's British parent company, when, in fact, the resin manufactured by Scott Bader's parent company contained pure acrylic, while Texigel was made from acrylamide.
- Scott Bader misrepresented that Sandstone was the only customer to complain about roofing problems associated with Scott Bader's products. Sandstone contended that Scott Bader had received other customer complaints.

Sandstone also alleged that Scott Bader was aware that Texigel deviated from its product specifications; that is, it was aware that Goodrich, its toll manufacturer, had at some point deviated from the resin formula of Scott Bader's parent company and had started using styrene acrylic instead of pure acrylic to make Texigel. Sandstone alleged that Scott Bader was also aware that quality control issues persisted with Texigel, even after Scott Bader contracted with a new toll manufacturer, Para–Chem. Sandstone asserted that, de-

spite Scott Bader's awareness of these problems and its awareness of Sandstone's customer complaints, Scott Bader never disclosed this information to Sandstone.

During the course of the litigation, a discovery dispute arose between the parties. Sandstone filed two separate motions to compel production of information and documentation regarding product specification and testing, other customer complaints received by Scott Bader, and the identity of the current or former Scott Bader employee most knowledgeable regarding product development and formulation issues.

In its response to Sandstone's second motion to compel, Scott Bader represented that it had produced all testing documents and that it had no customer complaints, other than those of Sandstone. Scott Bader also represented that it had never been involved in the mixing or formulation of Texigel, rather it was a supplier and seller of the product. Scott Bader's counsel also informed Sandstone that the person with the most knowledge regarding product formulation was not a Scott Bader employee but was a person who resided in the United Kingdom. Scott Bader did not reveal the identity of the person.

From May 2004 until March 2005, Scott Bader produced approximately 200 pages of documents to Sandstone in response to Sandstone's discovery requests. On March 1, 2005, Scott Bader produced 8,000 pages of documents to Sandstone. Before the production of these documents, Scott Bader had filed two no-evidence motions for summary judgment against Sandstone. Also at this point, Sandstone had already taken numerous depositions.

On August 15, 2005, which was shortly before trial, Sandstone filed its "Trial Brief in Support of Sanction, Spoliation Instruction, and/or Continuance." The principal

basis for the motion was a document produced for the first time by Scott Bader on March 1, 2005 as part of the 8,000–page document production. The document was a memorandum authored by Scott Bader employee, David Boothe. The Boothe memorandum was the first page of a 17–page document that had previously been produced sans the memorandum.

The Boothe memorandum was written on November 9, 2000 and identifies concerns associated with Scott Bader's transition from toll manufacturer Goodrich to toll manufacturer Para–Chem. The Boothe memorandum stated that Texigel was manufactured by Goodrich until August of 1999 and that Scott Bader "changed to Para–Chem at that time to start a closer relationship with the [Para–Chem] folks and to increase our margins" on Texigel. The Boothe memorandum revealed that, at the time of the transition, Scott Bader was without a president and that Terry Strickland (an employee of Scott Bader's British parent company) was the "main lead" on the transition from Goodrich to Para–Chem. The Boothe memorandum stated that "our singular pursuit should be to handle viscosity drift and stability issue." The memorandum acknowledges that the "USA formulation" for Texigel differs from the "UK version" because the "US version contains acrylamide, where the UK version does not."

The memorandum notes that the "UK people" handled the transfer from Goodrich to Para–Chem and continues,

> There was no control material sent at the time. The lab material was made and reviewed in the UK and approvals were sent from the UK. Once we changed to [Para–Chem], we never went back to [Goodrich]. It is now Nov. 2000 and we are reviewing the scale up performed at [Para–Chem] because we believe we have a slightly different product

due to viscosity drifts and also extra tackiness (as reported from our customers).

Sandstone contended that the Boothe memorandum was a "smoking gun" document because it refuted many of the previous representations made by Scott Bader during the discovery process. Specifically, Sandstone asserted that the Boothe memorandum refuted the following earlier representations made by Scott Bader during discovery:

- No personnel from Scott Bader's parent company in the United Kingdom were involved in the control of Scott Bader;
- Scott Bader had no corporate representatives knowledgeable about the formulation and testing of Texigel;
- No changes had been made to Texigel since 1995, other than changing toll manufacturers; and
- Scott Bader had no other customer complaints regarding Texigel, aside from those of Sandstone.

In addition, Scott Bader produced documents revealing that, at one point, Strickland had been Scott Bader's director. Sandstone contended that this was relevant because it further highlighted the importance of Strickland's role in the production of Texigel. Sandstone alleged that Scott Bader should have identified Strickland as the corporate representative with the most knowledge of formulation and testing for deposition purposes.

Scott Bader also produced customer invoices from which the customer names and addresses had been redacted by hand. Sandstone asserted that Scott Bader had redacted the information to prevent Sandstone from identifying other customers that may have experienced similar problems with Texigel, as referenced in the Boothe memorandum. Sandstone also

pointed out that it had discovered that another Scott Bader customer, Sealoflex, had complained to Scott Bader about a roofing issue. Scott Bader did not produce the documents related to the Sealoflex complaint; rather, Sandstone had obtained the documents by subpoena directly from Sealoflex. The trial court granted Sandstone's request for sanctions following a hearing. In its sanctions order signed on August 22, 2005, the trial made the following findings of fact:

a. The Court finds that Defendant SCOTT BADER has knowingly and in flagrant bad faith engaged in discovery abuse, including the following:

(i) withholding critical responsive documents until the production of more than 8,000 pages of documents on March 1, 2005, after the depositions in the lawsuit had already taken place of witnesses set in this order [the trial court later identified the depositions of eight witnesses].

(ii) producing documents in a manner calculated to conceal information (through removing the key first page of a document and marking out information in other documents), with conflicting and inadequate explanations for the same that lack credibility;

(iii) presenting deposition witnesses with such critical documents and information concealed or not produced;

(iv) failing to name Terry Strickland as a witness with knowledge of relevant facts, or to produce responsive documents, related to Strickland's role as director of Defendant SCOTT BADER, his role as the "main lead" in Defendant SCOTT BADER's transition from using Co–Defendant Good-

rich['s] services to those of Co–Defendant Para–Chem, his direct supervision over specific issues regarding the formulation and testing of Defendant's product, and his direct involvement in specific issues related to customer reports of problems.

(v) failing to produce as a corporate representative a witness with knowledge as requested; and

(vi) filing two no-evidence motions for summary judgment motions on December 10, 2004 and February 23, 2005, respectively, when Defendant SCOTT BADER and its counsel knew that the production of documents and witnesses was deficient.

b. In particular, [the] Court finds that Defendant SCOTT BADER's actions were calculated to conceal evidence that would indicate

(i) that SCOTT BADER's product did not meet its stated specifications; and

(ii) that the stated specifications were modified.

c. The Court further finds that Defendant SCOTT BADER's actions and representations to the Court throughout the pretrial discovery indicate a pattern or history of bad faith discovery abuse, demonstrate callous disregard for the responsibilities of discovery under the rules, and significantly interfere with the integrity and core judicial functions of this Court and its rulings;

d. For all of the reasons of [sic] above, the Court finds that Defendant SCOTT BADER prejudiced Plaintiff SANDSTONE's ability to present its case.

The trial court's sanctions order further provides,

The sanctions order below is directly related to the offensive conduct, and is appropriate and necessary because a lesser sanction will not promote compliance. The Court has considered the possibility of all lesser available options. Under these circumstances, however, there is no lesser sanctions available to address and deter Defendant SCOTT BADER's conduct while preserving SANDSTONE's rights.

The trial court awarded the following sanctions to Sandstone:

Plaintiff has requested and shall be entitled to the following jury instruction, which shall be treated as a partial default judgment limiting issues in dispute as Defendant Scott Bader, Inc. and its indemnified co-defendant's pleadings [are] struck to this extent:

"You are to presume (1) that the product that was shipped between mid–1999 and 2001 did not meet the specifications Scott Bader provided to Sandstone, and (2) that the specifications that Scott Bader provided to Sandstone for the product during mid–1999 and 2001 were modified."

Defendant SCOTT BADER and the party it indemnifies [NPCI] shall not be permitted to rebut the factual presumptions above and any affirmative defenses addressed to this issue shall be stricken.

The trial court also ruled that Scott Bader could not use Terry Strickland as a witness at trial and ordered that Scott Bader "may not use the deposition testimony of any witness from a deposition unless SCOTT BADER first demonstrates to the Court that such deposition was taken after full production of documents." The trial court then identified eight witnesses that were deposed before Scott Bader's "production of critical documents on March 1, 2005."

The trial court further ordered that Scott Bader pay $68,000 in sanctions for attorney's fees and expenses incurred by Sandstone attributable to Scott Bader's discovery abuse. The trial court also set aside earlier rulings on summary judgments and struck motions for summary judgment filed after March 1, 2005. Lastly, the court granted Goodrich's and Para–Chem's request that Sandstone's claims against them be tried separately.

Shortly after the court signed the sanctions order, the case proceeded to trial against Scott Bader. On August 30, 2005, the third day of trial, Scott Bader's lead trial counsel, Amy Wright, violated an in limine order when she "intentionally injected liability insurance of [Sandstone] into the evidence presented in front of the jury." For this conduct, the trial granted Sandstone's request for mistrial and sanctioned Wright and her law firm, Kern & Wooley, $79,012.40, representing Sandstone's "reasonable and necessary fees and expenses" from voir dire through the hearing on the motion for sanctions.

The trial court signed an order severing this order and the earlier sanctions order for discovery abuse from the remainder of the case. The trial court also signed a final judgment in the severed cause incorporating the sanction orders, thereby making the sanction orders final and appealable.

## THE SANCTIONS APPEAL

In their third issue, appellants challenge the sanctions awarded against them. Scott Bader challenges the sanctions for discovery abuse. Wright and her law firm challenge the sanctions for Wright's violation of the in limine order.

## A. Discovery Abuse Sanctions

### 1. Standard of Review and Governing Principles

■ We review a trial court's ruling on a motion for sanctions under an abuse of discretion standard. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex.2004). A trial court abuses its discretion when its ruling is arbitrary and unreasonable without reference to any guiding rules and principles. *Id.* at 838–39. In conducting our review, we are not limited to a review of the "sufficiency of the evidence" to support the trial court's findings; rather, we make an independent inquiry of the entire record to determine if the court abused its discretion by imposing the sanction. *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 234 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) (op. on reh'g).

■ Rule of Civil Procedure 215.2 allows a trial court to enter "just" sanctions for a party's failure to comply with a discovery order or request. TEX.R. CIV. P. 215.2. The Supreme Court of Texas in *TransAmerican Natural Gas Corp. v. Powell* developed a two-part test for courts to apply when determining whether a sanction is "just." 811 S.W.2d 913, 917 (Tex.1991). First, there must be a direct nexus among the offensive conduct, the offender, and the sanction imposed. *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex.2003) (citing *TransAmerican*, 811 S.W.2d at 917). A just sanction must be directed against the abuse and toward remedying the prejudice caused to the innocent party, and the sanction should be visited upon the offender. *Id.*

■ Second, just sanctions must not be excessive. *TransAmerican*, 811 S.W.2d at 917. That is, a sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes, which includes securing compliance with discovery rules, deterring other litigants from similar misconduct, and punishing violators. *Id.; see Spohn Hosp.*, 104 S.W.3d at 882; *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex.1992). For this reason, the supreme court requires courts to consider less stringent sanctions and whether such lesser sanctions would fully promote compliance. *TransAmerican*, 811 S.W.2d at 917; *see Cire*, 134 S.W.3d at 839; *Spohn Hosp.*, 104 S.W.3d at 882.

### 2. Scott Bader's Abuse of the Discovery Process

Scott Bader first contends that the discovery abuse sanctions are "unjust" because it did not abuse the discovery process. *See In re Supportkids, Inc.*, 124 S.W.3d 804, 807 (Tex.App.-Houston [1st Dist.] 2003, orig. proceeding) (recognizing that determination of whether direct relationship exists between offensive conduct and sanctions imposed "necessarily requires determining whether the underlying conduct actually constitutes an abuse of the discovery process"). As discussed, the trial court listed in its findings of fact six bases to sanction Scott Bader for discovery abuse. On appeal, Scott Bader attacks the trial court's findings that it abused the discovery process by failing to identify Terry Strickland, by altering invoices to conceal customer information, and by failing to produce timely the Boothe memorandum.[4]

■ Scott Bader contends that Terry Strickland's identity was disclosed at various points throughout the discovery process. Scott Bader also contends that

**4.** We note that Scott Bader only assails three of these bases on appeal as not constituting discovery abuse.

Strickland was only the director of Scott Bader for a short period in 1998. Sandstone does not dispute either contention. Rather, the basis of the discovery sanction was that discovery was propounded to which Scott Bader should have disclosed, not only Strickland's name, but also the various key roles Strickland played with regard to managing Scott Bader and his knowledge of the testing and formulation of Texigel. Scott Bader points out that, when it was requested to disclose the identity of persons with knowledge regarding such matters as testing and formulation of Texigel or with knowledge of changes made to Texigel since 1999, Scott Bader responded that none of its U.S. employees had such knowledge. Though such response was technically correct, it could also be viewed as misleading. Strickland was a director of Scott Bader at a time critical to the lawsuit and was a person with knowledge regarding matters central to Sandstone's claims in this suit. Accordingly, we cannot say the trial court abused its discretion by imposing sanctions for Scott Bader's failure to disclose Strickland's identity in conjunction with the roles he played and the knowledge he possessed.

Scott Bader also challenges the trial court's finding that Scott Bader produced customer invoices in a manner calculated to conceal customer information from Sandstone; that is, that Scott Bader redacted customer information from the invoices produced to Sandstone to hide the identity of other customers, which may have had product complaints similar to those of Sandstone.

In response to the sanctions motions, Scott Bader offered the affidavit of its president, Nick Padfield, to explain that the invoices had been redacted as part of the ordinary course of Scott Bader's business, not to conceal information from Sandstone. According to Padfield, the customer and pricing information had been marked out because the invoices are stored in a warehouse in which Scott Bader's competitors also store documents. Padfield stated that the information had been redacted to protect competitive pricing information for its product. The trial court ultimately found this explanation to be "inadequate" and lacking "credibility." As we have previously recognized, the trial court is entitled to judge the credibility of the witnesses and the weight of their testimony in the context of a sanctions hearing. *Daniel,* 981 S.W.2d at 232. A finding that the documents had been altered to conceal customer information from Sandstone is also supported, as noted by the trial court, by the fact that, while customer information had been marked out on some of the invoices, other invoices did not have redacted customer information.

Based on the record, we cannot conclude that the trial court abused its discretion by finding that Scott Bader abused the discovery process by producing invoices in a manner calculated to conceal customer information.

██ Scott Bader further contends that no discovery abuse arose from its failure to produce the Boothe memorandum until five months before trial. It is uncontested that the Boothe memorandum was produced for the first time as part of the 8,000–page document production on March 1, 2005 and is the first page of a 17–page document.

The record also reveals that the document was produced by Scott Bader, *without the Boothe memorandum,* on July 15, 2004. The second page of the document had a handwritten number "1" on the top, right corner to make the second page appear as if it were the first page of the document, rather than the second. The deletion of the document was never pointed out to Sandstone, rather, the 17–page

document was ultimately produced with the Boothe memorandum toward the end of an 8,000–page document production. The record further reveals that at least eight witnesses, including the memorandum's author, David Boothe, were deposed before Sandstone had received the memorandum. Therefore, based on the record, we cannot conclude that the trial court abused its discretion by finding that Scott Bader's manner of producing the Boothe memorandum was sanctionable conduct.

■ As mentioned, the trial court awarded sanctions based not only on these three incidents of discovery abuse, but also on the other sanctionable conduct listed in the sanctions order. We recognize that, in assessing sanctions, the trial court is entitled to consider the entire course of the litigation. *Broesche v. Jacobson*, 218 S.W.3d 267, (Tex.App.-Houston [14th Dist.] 2007, pet. denied). Based on the entire record and the instances of misconduct we have discussed, we conclude the trial court did not abuse its discretion by finding that Scott Bader had engaged in sanctionable conduct during the discovery process.

Next, we determine whether the trial court abused its discretion by assessing the sanctions challenged by Scott Bader.

### 3. Partial Default Judgment Limiting Issues in Dispute

■ As mentioned, the trial court ordered that the jury be instructed that Scott Bader's product did not meet specifications and that product specifications provided by Scott Bader to Sandstone had been modified, which was treated as a partial default judgment against Scott Bader. Concomitantly, the trial court prohibited Scott Bader from rebutting "the factual presumptions above" and struck

Scott Bader's affirmative defenses "addressed to this issue." Scott Bader contends that the trial court abused its discretion by imposing these sanctions without considering the imposition of lesser sanctions. We agree.

Because a sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes, courts must first consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance. *See TransAmerican*, 811 S.W.2d at 917. To this end, the record must reflect that the court considered the availability of lesser sanctions. *Otis Elevator Co. v. Parmelee*, 850 S.W.2d 179, 181 (Tex.1993); *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852–53 (Tex.1992). In this respect, the *Cire* court explained, "The trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed." 134 S.W.3d at 842; *see also GTE Commc'n Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex.1993).

Here, the trial court stated in the sanctions order that the imposed sanctions were "appropriate and necessary because a lesser sanction will not promote compliance." It continued, "The Court has considered the possibility of all lesser available options. Under these circumstances, however, there is no lesser sanctions available to address and deter Defendant SCOTT BADER's conduct while preserving SANDSTONE's rights."

■ Like other courts before us, "[w]e give no deference to such unsupported conclusions" regarding the trial court's consideration of lesser sanctions.[5] *GTE*,

---

5. For example, the trial court may have considered one or more of the following lesser sanctions: (1) continue the trial to allow

Sandstone to re-depose those witnesses whose depositions were taken before Sandstone had the opportunity to review the docu-

856 S.W.2d at 729; *accord In re Adkins,* 70 S.W.3d 384, 391 (Tex.App.-Fort Worth, 2002, orig. proceeding); *cf. Cire,* 134 S.W.3d at 842 ("The discussion in the trial court's order goes beyond simply stating that lesser sanctions would not be effective; the order contains an extensive, reasoned explanation of the appropriateness of the sanction imposed, demonstrating that the trial court considered the availability of less stringent sanctions as we have required."). Beyond this general statement and description of the offensive conduct, the trial court in this case offered no reasoned explanation of the appropriateness of the sanctions imposed. *See CitiBank v. Hanke,* No. 03–04–00641–CV, 2006 WL 952538 at *3 (Tex.App.-Austin Apr.14, 2006, no pet.) (mem.op.) (reversing sanctions award, court noted that, although sanctions order referred to certain behavior by Citibank to support sanctions, no reasoned explanation of appropriateness of sanctions, based on that behavior, was provided in order). The record does not otherwise reveal that the trial court

considered lesser sanctions or indicate why lesser sanctions would not deter Scott Bader "while preserving the rights of Sandstone."[6]

■ The trial court did not comply with the second prong of the *TransAmerican* test by insuring that the partial default judgment sanctions assessed against Scott Bader were not excessive. The guiding rules with respect to discovery-abuse sanctions required the trial court to consider the availability of lesser sanctions. *See GTE,* 856 S.W.2d at 729; *TransAmerican,* 811 S.W.2d at 917. Based on the record before us, we hold that the trial court abused its discretion (1) by ordering that the jury be instructed that Scott Bader's product did not meet specifications and that product specifications provided by Scott Bader to Sandstone had been modified, (2) by prohibiting Scott Bader from rebutting these presumptions, and (3) by striking Scott Bader's affirmative defenses "addressed to this issue," without first considering lesser sanctions.[7] *See Supportkids,* 124 S.W.3d at 808.

---

ment production of March 1, 2005; (2) order that all costs of these depositions and any other further discovery necessitated by the March 1 document production, or any other discovery abuse identified, be taxed against Scott Bader; (3) give a spoliation instruction with regard to the altered customer invoices or missing Boothe memorandum; (4) compel production of Scott Bader's customer information with an admonition that failure to do so would result in further sanctions; (5) compel Scott Bader to name a corporate representative with the requested knowledge and warn that failure to comply would result in greater sanctions.

6. We note that the record reflects that Sandstone had filed two motions to compel during the course of discovery process. However, the record does not reflect whether the trial court rendered any orders on these motions. In any event, an order to compel does not alone qualify as a "lesser sanction." *See Bair v. Hagans,* 838 S.W.2d 677, 681 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

7. To support the justness of the sanctions, Sandstone cites additional documents that were discovered post-trial, which it contends were wrongfully withheld by Scott Bader during the discovery process and which it contends are highly probative of Scott Bader's liability in this case. Sandstone invites us to consider these newly discovered documents in our determination of whether the trial court abused its discretion when it assessed the discovery sanctions. We decline to so. "[A] judgment cannot rest upon what may or may not occur after its rendition." *In re Harvest Communities of Houston, Inc.* 88 S.W.3d 343, 348 (Tex.App.-San Antonio 2002, orig. proceeding). For this reason, we consider only the record that was before the trial court when it rendered the sanctions to determine whether the trial court's sanctions judgment was rendered in accordance with the guiding principles set forth in *TransAmerican. Id.* In any event, we fail to see how these additional documents remedy the lack of consideration of lesser sanctions in this case.

### 4. Use of Deposition Testimony At Trial

Scott Bader also challenges the trial court's sanction prohibiting it from using at trial the deposition testimony of eight witnesses, whose depositions were taken after the March 1, 2005 document production, unless Scott Bader first demonstrated that "such deposition was taken after full production of documents." As with the sanctions discussed above, the record does not show that the trial court first considered whether lesser sanctions were available, and if so, whether such lesser sanction would promote compliance.[8] Accordingly, we hold that the trial abused its discretion by prohibiting Scott Bader's use of the eight depositions without considering lesser sanctions. *See In re Patton,* 47 S.W.3d 825, 828 (Tex.App.-Fort Worth 2001, orig. proceeding) (concluding that trial court abused its discretion by excluding trial exhibits when no lesser sanctions considered); *cf. Adams v. Allstate County Mut. Ins. Co.,* 199 S.W.3d 509, 513–514 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (holding no abuse of discretion shown for striking affidavit when trial court had previously implemented less stringent measure to no avail).

### 5. Attorney's Fees as Sanctions

The trial court awarded $68,000 in sanctions for attorney's fees and expenses "attributable to Scott Bader's discovery abuse." Scott Bader states in its brief that, to the extent that it was properly found to have abused the discovery process, it "does not quarrel with assessment of attorney's fees related to preparing and arguing a meritorious motion for sanctions, or to undertaking additional discovery made necessary by improperly withheld documents." Instead, Scott Bader com-

plains that the sanctions are not shown to be directly related to the sanctionable conduct because the sanctions are unsupported in the record by competent evidence.

In support of its request for attorney's fees as sanctions, Sandstone's submitted the affidavit of one its attorneys, Allison B. Waters, who stated,

> To date, our total fees [are] at least $411,066.55. Costs, which include travel expenses for numerous depositions (in Colorado, Ohio, Pennsylvania and Florida), are at least $36,151.84. Of these amounts, I believe [Sandstone] has incurred fees and expenses totaling $68,000, which are associated with Scott Bader's discovery abuse, as outlined in Sandstone's trial brief on spoliation, which was presented to the Court on August 15, 2005.

In the trial court, Scott Bader objected that the affidavit was "conclusory, not supported by any evidence and does not establish that any of the expenses or fees were reasonable or necessary." On appeal, Scott Bader contends that "[a] conclusory statement regarding the amount of attorney's fees incurred is insufficient to support an award of fees when there is no indication of what the fees were and no basis to establish whether they were reasonable." Scott Bader asserts that "Sandstone's evidence of fees does not establish that the fees incurred were reasonable and necessary or summarize the hours worked and rate charged."

In cases in which the judgment is not one for earned attorney's fees, but rather a judgment imposing attorney's fees as sanctions, it is not invalid because a party fails to prove attorney's fees. *Con-*

---

**8.** Scott Bader suggests that one lesser sanction would be to allow Sandstone to re-depose the eight witnesses at Scott Bader's expense.

dit v. Gonzales, No. 13–04–426–CV, 2006 WL 2788251, at *12 (Tex.App.-Corpus Christi Sept.28, 2006, no pet.) (mem.op.) (citing Glass v. Glass, 826 S.W.2d 683, 688 (Tex.App.-Texarkana 1992, writ denied)). "When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required." Miller v. Armogida, 877 S.W.2d 361, 365 (Tex.App.-Houston [1st Dist.] 1994, writ denied); see Brantley v. Etter, 677 S.W.2d 503, 504 (Tex.1984). Therefore, by focusing on the lack of evidentiary value of Waters's affidavit to prove the reasonableness and necessity attorney's fees actually earned by Sandstone's attorneys, Sandstone has not demonstrated that the trial court abused its discretion when it awarded $68,000 in attorney's fees as sanctions. See Allied Assoc. v. INA County Mut. Ins., 803 S.W.2d 799, 799 (Tex.App.-Houston [14th Dist.] 1991, no writ).

Moreover, the record indicates that much of Sandstone's attorney time was affected by the sanctionable conduct. At least eight depositions were taken by Sandstone in locations across the United States without the benefit of the Boothe memorandum. In addition, the record reflects that Sandstone's counsel prepared two motions to compel discovery and engaged in communications with Scott Bader's counsel over a substantial period in an attempt to obtain discoverable information. Though the filings from the summary judgment proceedings are not contained in the record, it can reasonably be surmised that Sandstone's counsel spent time addressing the no-evidence motions for summary judgment that were ultimately stricken in the sanctions order. The record further shows that Sandstone's counsel prepared several filings in conjunction with the motion for sanctions and attended hearings on the sanctions request.

Accordingly, we conclude that Scott Bader has not shown that the trial court abused its discretion by awarding $68,000 in attorney's fees and expenses as sanctions.

## B. Sanctions for Violating the In Limine Order

■ Wright and her law firm (collectively "Wright") also appeal the trial court's sanction for Wright's violation of an in limine order, resulting in a mistrial. As mentioned, the trial court assessed monetary sanctions in the amount of $79,012.40 against Wright and her law firm for "reasonable and necessary" attorney's fees and expenses incurred by Sandstone from voir dire through the hearing on the motion for sanctions related to the first trial.

Wright and her firm contend on appeal that Sandstone did not properly establish these fees. The fees awarded represent the legal fees incurred by Sandstone for one week's worth of trial preparation and for attending trial. Wright and her firm contend that Sandstone should not receive the fees for the one week of trial preparation because the second trial commenced almost immediately after the mistrial. Wright and her firm also point out that, at the sanctions hearing, Sandstone presented one lump sum bill and did not present an itemized bill, an affidavit, or sworn testimony to support the award.

■ The record shows that Wright never raised the challenges in the trial court that are now raised on appeal regarding the sanctions. To preserve a complaint for appellate review, a party must have presented a request, objection, or motion to the trial court stating specific grounds for the ruling desired. See Tex. R.App. P. 33.1(a)(1). We have previously applied the rule to a party's failure to raise objections to sanctions in the trial court. See Valdez v. Valdez, 930 S.W.2d 725, 728

(Tex.App.-Houston [1st Dist.] 1996, no writ) (holding appellant waived objection to sanctions raised for first time on appeal). By failing to raise the complaints now presented, Wright never gave the trial court the opportunity to correct the alleged error. We hold that Wright has waived the challenges presented on appeal to the sanctions assessed for violating the in limine order. *See id.*

### C. Conclusion Regarding Sanctions Appeal

To summarize, we hold that the trial court abused its discretion by ordering that (1) the jury be instructed that Scott Bader's product did not meet specifications and that product specifications provided by Scott Bader to Sandstone had been modified, which instructions the trial court ordered be treated as a partial default judgment limiting issues in dispute; (2) certain of Scott Bader's affirmative defenses be stricken; and (3) Scott Bader be prohibited from using at trial the testimony of eight identified witnesses.[9] We hold that the trial court did not abuse its discretion by assessing monetary sanctions against Scott Bader in the amount of $68,000 for discovery abuse and by assessing monetary sanctions against Wright and her firm in the amount of $79,012.40 for violating an in limine order.

Accordingly, Scott Bader's third issue is sustained, in part, and overruled in part.

### Appeal of Judgment Rendered Following Jury Trial

Next, in appellate cause number 01–06–00593–CV, we determine the propriety of the money judgment rendered in Sandstone's favor against Scott Bader, following the jury trial. In its third issue, Scott

Bader contends that the judgment should be reversed and remanded because the sanctions rendered by the trial court resulted in an erroneous jury charge.

### A. Background Relevant to Claimed Charge Error

As discussed, a mistrial was declared based on the misconduct of Scott Bader during trial. The second trial began shortly after the mistrial. On September 15, 2005, in the midst of trial, the trial court signed a "Supplemental Order On Sanctions," which provided, in relevant part, as follows:

> Issues have arisen during trial requiring application of the August Sanctions order. It is
>
> ORDERED that the breach of warranty is established with damages from Defendants' breach to be submitted to the jury; and Defendant may bring forward evidence that does not rely on any stricken deposition to establish causation for failures other than an affirmative defense of Plaintiff's conduct.
>
> ORDERED that Defendant's affirmative defenses and its general denial were stricken to the extent that the Court's prior order to preclude litigation of issues rebutting the established issues. Defendants are not entitled to raise quality control issues about Sandstone to negate evidence that the product was out of specification before reaching Sandstone....

When the case was presented to the jury, the court gave the following instructions:

### BINDING INSTRUCTIONS

The following instructions are binding on the jury.

---

**9.** We note that Scott Bader did not complain of the trial court's order that Scott Bader could not use Terry Strickland as a witness at trial and of the trial court's order striking the defendants' motions for summary judgment and summary judgment rulings.

You are given these binding instructions by the Court for all purposes in this Charge and to govern your deliberations and answers to the Jury Questions.

The Jury is instructed that:

(1) The specifications that Scott Bader provided to Sandstone for the product during mid–1999 and 2001 were modified.

(2) The product that was shipped between mid–1999 and 2001 did not meet the specifications Scott Bader provided to Sandstone.

These instructions are also binding instructions. You are further instructed that:

*Modification of Specifications*

Such modification of the specifications is a breach of the sales contract between Scott Bader and Sandstone.

Such modification is a breach of the warranty from Scott Bader to Sandstone.

*Failure to Meet Specifications*

Such failure to meet specifications is a breach of the sales contract between Scott Bader and Sandstone.

Such modification [sic] is a breach of the warranty from Scott Bader to Sandstone.[10]

The first jury question following the binding instructions asked the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Sandstone Products, Inc. for its damages, if any, that resulted from modification of specifications and failure to meet specifications as instructed?" In response to this question, the jury awarded Scott Bader a total of $3,375,000 in actual damages.

The next four questions pertained to Sandstone's DTPA claim. The jury found that Scott Bader had engaged in a "false, misleading, or deceptive practice" and in unconscionable actions and that such actions were a producing cause of damages to Sandstone. The jury also found that Scott Bader's modification of specifications and failure to meet specifications was a producing cause of damages to Sandstone. The jury further found that Scott Bader's DTPA violations were committed knowingly. In addition to the actual damages awarded in the first jury question, the jury awarded $950,000, $225,000, and $25,000 for each of Scott Bader's knowing violations of the DTPA.

The jury further found that Scott Bader had committed fraud and negligent misrepresentation. With regard to these claims, the jury awarded Sandstone $300,000 for the reasonable and necessary cost of the repair or replacement of the failed roof coatings and $30,000 for Sandstone's past lost profits. Lastly, the jury awarded Sandstone $486,000 for attorney's fees.

The trial court rendered judgment awarding Sandstone the actual damages found by the jury in Question Number 1, totaling $3,375,000, the $950,000 in additional damages awarded for Scott Bader's knowing DTPA violation, and $486,000 for attorney's fees. The trial court also awarded $903,667 in pre-judgement interest.

In its third issue, Scott Bader contends that the trial court erred by including the "Binding Instructions" in the jury.

**B. Standard of Review**

 We review the trial court's submission of jury instructions for an abuse of discretion. *See Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791

---

10. Presumably, the trial court intended to instruct the jury that such failure *to meet speci-* *fications* is a breach of the warranty from Scott Bader to Sandstone.

(Tex.1995). When an incorrect jury instruction was given, we reverse only if the instruction " 'was reasonably calculated to and probably did cause the rendition of an improper judgment.' " *Bed, Bath & Beyond, Inc. v. Urista,* 211 S.W.3d 753, 757 (Tex.2006) (quoting *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995)); *see* TEX. R.APP. 44.1(a)(1). We examine the entire record to evaluate whether the instruction probably caused the rendition of an improper verdict. *Urista,* 211 S.W.3d at 757.

## C. Propriety of Binding Instructions

In its third issue, Scott Bader contends that the Binding Instructions were improper. Given our holding in appellate cause number 01–05–00940–CV that the trial court abused its discretion by ordering, in its August 22 sanctions order, that the jury be instructed that Scott Bader's product did not meet specifications and that the product specifications provided by Scott Bader to Sandstone had been modified, we conclude that the Binding Instructions given to the jury were improper.

Sandstone contends that the Binding Instructions were proper because they were not based on the August 22 sanctions order but rather on the September 15 Supplemental Order On Sanctions or, alternatively, resulted from a directed verdict granted at the charge conference. Sandstone also asserts that Scott Bader waived its objection to the Binding Instructions. We disagree with all three of Sandstone's contentions.

We are cognizant that the Binding Instructions not only instructed the jury that Scott Bader's product did not meet specifications and that the product specifications provided by Scott Bader to Sandstone had been modified, as provided in the August 22 sanctions order, but also instructed the jury that Scott Bader's modification of specifications and failure to meet specifica-

tions each constituted breach of contract and breach of warranty. Though these additional instructions expand on the original instructional language found in the original August 22 sanctions order, the record indicates that these additional instructions derived from the original sanctions. On its face, the September 15 order indicates that it served to supplement the August 22 sanctions order and to clarify how the August 22 sanctions should be applied. In other words, the September 15 sanctions order was not an independent sanctions order, but was a supplemental order dependent on the August 22 sanctions. Moreover, the Binding Instructions instructed the jury that Scott Bader's conduct constituted both breach of contract and breach of warranty while the September 15 Supplemental Order On Sanctions ordered only that "the breach of warranty [claim] is established" and did not address the breach of contract claim.

At the charge conference, Scott Bader objected to the Binding Instructions. In so doing, Scott Bader renewed its objection to the sanctions order by stating that it "did not commit sanctions abuse" and, if it did, that the abuse could have been remedied by lesser sanctions. Scott Bader also objected on the grounds that the Binding Instructions were an "expansion of the [original] sanctions order." Specifically, Scott Bader objected to the language in the Binding Instructions which instructed the jury that Scott Bader's modification of specifications and its failure to meet specifications constituted breach of contract and breach of warranty. Scott Bader asserted that such instruction impermissibly expanded on the language of the original sanctions order. Thus, Scott Bader preserved its challenge to the Binding Instructions.

Sandstone also contends that the Binding Instructions were not derived from

August 22 sanctions order but were based on a request by Sandstone for a directed verdict at the charge conference based only on the evidence at trial. Such contention is not supported by the record.

When Scott Bader objected on the ground that the Binding Instructions improperly expanded on the August 22 sanctions language, the trial court stated that "I've instructed the verdict with regard to that." Only after that comment by the trial court did Sandstone move for directed verdict. In requesting the directed verdict, Sandstone stated that it requested a directed verdict based on the evidence that was presented *and* on the sanctions order. At which point, the trial court stated that it believed it had previously granted a directed verdict on the issues set out in the Binding Instructions. Thus, it is apparent from the record that the Binding Instructions do not arise from a directed verdict based on the evidence, rather the Binding Instructions were based on the previously ordered sanctions.

Because they were derived from the improper August 22 sanctions, we conclude that the trial court abused its discretion when it included the Binding Instructions in the charge. Next, we determine whether the Binding Instructions were harmful.

## D. Harm

As mentioned, the trial court's judgment awards Sandstone $3,375,000 in actual damages. This amount corresponds to the total amount of actual damages awarded by the jury in response to Question 1, which immediately followed the Binding Instructions. Question 1 was an unpredicated damages question, which read,

"What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Sandstone Products, Inc. for its damages, if any, that resulted from modification of specifications and failure to meet specifications as instructed?"

Immediately following Question 1 was a series of questions related to Sandstone's DTPA claim. The jury made a positive liability finding against Scott Bader regarding Sandstone's DTPA claim. From the face of the charge, it cannot be determined whether the jury awarded the $3,375,000 in actual damages based on the trial court's instructed liability findings for Sandstone's breach of contract or breach of warranty claims, or whether the award was based on the jury's DTPA liability finding. It is apparent, however, that the damages finding was shaped by the improper Binding Instructions.

In reaching its damages finding in Question 1, the jury was limited to considering only those damages that "resulted from modification of specifications and failure to meet specifications *as instructed.*" (Emphasis added.) As a result, even if the award was based on the DTPA liability finding, the only DTPA violations for which damages could be awarded in Question 1 were those arising "from [Scott Bader's] modification of specifications and failure to meet specifications as instructed." Thus, regardless of which liability theory the jury positively found to support the damages award in response to Question 1, we hold that the Binding Instructions probably caused the rendition of an improper judgment.[11] *See* TEX.R.APP. 44.1(a).

We sustain Scott Bader's third issue.

---

11. We further hold that the trial court's award of $950,000 in additional damages under the DTPA, $486,000 for attorney's fees, and $903,667 for pre-judgment interest are not supportable. Each of these awards is dependent on the jury's findings of actual damages in response to Question 1. *See* TEX. BUS. & COM.CODE ANN. § 17.50(b),(d) (Vernon Supp.2007); *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997). For this reason,

### E. Disposition of Appeal

 In issue one, Scott Bader challenges the admissibility of Sandstone's causation expert, asserting that the expert opinion was unreliable and thus inadmissible. Scott Bader further alleges that, because the expert's opinion was the only evidence of causation, "there is no evidence to support Sandstone's causation theory." In issue two, Sandstone contends that the evidence was legally insufficient to support the damages awarded by the jury in response to Question 1.

We recognize that the legal sufficiency challenges raised by Scott Bader in both issues, if successful, result in rendition. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex.1992) (recognizing that, as general rule, "when we sustain a no evidence point of error after a trial on the merits, we render judgment on that point."). We do not separately address issues one and two, however. Even if sustained, resolution of issues one and two would not result in greater relief for Scott Bader, in this case, than that afforded by our resolution of the charge error addressed above with respect to Scott Bader's third issue. That is, we would still remand instead of reverse and render if we sustained either issue one or two because the trial court's sanctions prevented this case from being properly developed and presented at trial.

 Appellate courts have broad discretion to remand for a new trial in the interest of justice. *See* Tex.R.App. P. 43.3(b). In this case, regardless of whether Sandstone presented legally insufficient evidence to support the amount of actual damages awarded by the trial court, or presented insufficient evidence of causa-

we need not address Scott Bader's fourth issue separately challenging the award of pre-

tion, we conclude that justice would be best served by remanding the case. We may remand for new trial when damages were improperly calculated by the plaintiff, and the interest of justice requires that the plaintiff be given an opportunity to show the proper measure of his damages. *Walters v. Northcutt*, No. 12-03-00247-CV, 2005 WL 341694 at*10-11 (Tex.App.-Tyler Feb. 10, 2005, no pet.) (mem.op.); *Varel Mfg. Co. v. Acetylene Oxygen Co.*, 990 S.W.2d 486, 500 (Tex.App.-Corpus Christi 1999, no pet.); *Williams v. Gaines*, 943 S.W.2d 185, 193-94 (Tex.App.-Amarillo 1997, writ denied); *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 616 (Tex.App.-Dallas 1990, writ denied). Remand is also appropriate when a case, for any reason, has not been fully developed. *United States Fire Ins. Co. v. Carter*, 473 S.W.2d 2, 3 (Tex.1971); *Kondos v. Lincoln Prop. Co.*, 110 S.W.3d 716, 724 (Tex.App.-Dallas 2003, no pet.); *Bayway Serv., Inc. v. Ameri-Build Constr., L.C.*, 106 S.W.3d 156, 161 (Tex. App.-Houston [1st Dist.] 2003, no pet.).

Here, the sanctions ordered by the trial court affected and shaped the presentation and development of this case during trial, for both Sandstone and Scott Bader. Had the sanctions not been levied, it seems indisputable that both sides would have presented additional evidence during trial. In light of our reversal today of the sanctions in appellate cause number 01-05-00940-CV, we conclude that this case is properly remanded for further proceedings on the issues of liability and damages. *See* Tex.R.App. P. 44.1(a)(1).

### Conclusion

In appellate cause no. 01-05-00940-CV, we affirm the trial court's judgment as to

judgment interest.

the monetary sanctions. We reverse the portion of the judgment, as discussed above, ordering that (1) the jury be instructed that Scott Bader's product did not meet specifications and that product specifications provided by Scott Bader to Sandstone had been modified, which instructions the trial court ordered be treated as a partial default judgment limiting the issues in dispute; (2) certain of Scott Bader's affirmative defenses be stricken; and (3) Scott Bader be prohibited from using at trial the testimony of eight identified witnesses, and remand the case for further proceedings.

In appellate cause no. 01–06–00593–CV, we reverse the judgment of the trial court and remand for further proceedings.[12]

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent. I would hold that the sanctions assessed against Scott Bader were well within the discretion of the trial court and that there is no requirement that the trial court explain its rejection of lesser sanctions when, as here, the trial court's order detailed the offending party's abuses and directly tailored sanctions specifically authorized by Rule 215 of the Texas Rules of Civil Procedure to cure the prejudice to the innocent party caused by the abuse. I would affirm the judgment of the trial court.

## The Test for Just Sanctions

The Texas Supreme Court has set out a two-part test for determining whether sanctions are just and therefore within the discretion of the trial court. *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991). That test requires that there be "a direct relationship ... between the offensive conduct and the sanction imposed," i.e., that the sanction be "directed against the abuse and toward remedying the prejudice caused by the innocent party" and that the sanctions not be "excessive." *Id.* at 917. In regard to the second prong, the court is required to consider the availability of less stringent sanctions and whether such lesser sanctions would fully provide compliance. *Id.* These standards set the bounds within which the trial court is to exercise its discretion to assess sanctions under Texas Rule of Civil Procedure 215 governing discovery abuse. *Id.* That test has been subsequently reaffirmed in *Spohn Hospital v. Mayer*, 104 S.W.3d 878, 882 (Tex.2003) (citing *TransAmerican*, 811 S.W.2d at 917) and *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex.2004).

## The Trial Court's Sanctions Order

The trial court's carefully articulated sanctions order in this case is set out in the majority opinion. That court made explicit findings that Scott Bader had "knowingly and in flagrant bad faith engaged in discovery abuse," including (1)

**12.** We are mindful that the jury also found liability and awarded damages to Sandstone under its fraud and negligent misrepresentation claims. For these claims, the jury awarded Sandstone $300,000 in damages for the reasonable and necessary costs of repairing or replacing its customers' roofs and $30,000 for lost profits. Sandstone elected not to recover under these theories. Sandstone has asserted that should we reverse the trial court's judgment, which was based on breach of contract, breach of warranty, and violation of the DTPA, it is still entitled to elect recovery under its alternate fraud and negligent misrepresentation theories. The parties have not adequately briefed the merits of these claims for us to address them; however, we permit the parties to address these alternate theories on rehearing, if they so choose. *See Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 650 n. 4 (Tex.App.-Houston [14th Dist.] pet. denied) (op. on reh'g).

"withholding critical responsive documents until the production of more than 8,000 pages of documents on March 1, 2005, after the depositions in the lawsuit had already taken place"; (2) "producing documents in a manner calculated to conceal information (through removing the key first page of a document and marking out information in other documents), with conflicting and inadequate explanations for the same that lack credibility"; (3) "presenting deposition witnesses with such critical documents and information concealed or not produced"; (4) "failing to name Terry Strickland as a witness with knowledge of relevant facts, or to produce responsive documents, related to Strickland's role as director of Defendant SCOTT BADER, his role as the 'main lead' in Defendant SCOTT BADER's transition from using Co–Defendant Goodrich['s] services to those of Co–Defendant Para–Chem, his direct supervision over specific issues regarding the formulation and testing of Defendant's product, and his direct involvement in specific issues related to customer reports of problems"; (5) "failing to produce as a corporate representative a witness with knowledge as requested"; and (6) "filing two no-evidence motions for summary judgment on December 10, 2004 and February 23, 2005, respectively, when Defendant SCOTT BADER and its counsel knew that the production of documents and witnesses was deficient."

The trial court found that Scott Bader's "actions were calculated to conceal evidence that would indicate ... that [its] product did not meet its stated specifications; and ... that the stated specifications were modified." It further found that Scott Bader's actions "indicate a pattern or history of bad faith discovery abuse, demonstrate callous disregard for the responsibilities of discovery under the rules, and significantly interfere with the integrity and core judicial functions of this Court and its rulings." For all of these reasons, the trial court found Scott Bader had prejudiced Sandstone's ability to present its case, and it concluded that a sanctions order "directly related to the offensive conduct ... is appropriate and necessary because a lesser sanction will not promote compliance."

The trial court sanctioned this behavior by requiring that the jury be instructed

"You are to presume (1) that the product that was shipped between mid–1999 and 2001 did not meet the specifications Scott Bader provided to Sandstone, and (2) that the specifications that Scott Bader provided to Sandstone for the product during mid–1999 and 2001 were modified."

The trial court ordered that Scott Bader and its indemnitee, NPCI, were not permitted to rebut the factual presumptions set forth above, and it struck affirmative defenses addressed to the issue. The court also ruled that Scott Bader could not use Terry Strickland as a witness at trial and that Scott Bader "may not use the deposition testimony of any witness from a deposition unless SCOTT BADER first demonstrates to the Court that such deposition was taken after full production of documents." The trial court then identified eight witnesses who were deposed before Scott Bader's "production of critical documents on March 1, 2005." Finally, the trial court ordered that Scott Bader pay $68,000 in sanctions for attorney's fees and expenses incurred by Sandstone attributable to Scott Bader's discovery abuse. The case then proceeded to a full trial in which Scott Bader was allowed to defend itself, with the foregoing limitations, and Sandstone was required to prove its case, including proving that its damages resulted from Scott Bader's actions.

Additional misconduct by Sandstone's counsel during trial resulted in the declaration of a mistrial and the necessity of beginning again. The sanctions order at issue in this appeal was issued during the second trial, after a hearing outside the presence of the jury, to clarify what was to be taken as established due to Scott Bader's misconduct and what Sandstone was required to prove. Scott Bader was permitted to "bring forward evidence that does not rely on any stricken deposition to establish causation for failures other than an affirmative defense of Plaintiff's conduct." The trial court made clear, however, that Scott Bader's affirmative defenses and its general denial were stricken to the extent of precluding litigation of issues rebutting the established issues and that Scott Bader was "not entitled to raise quality control issues about Sandstone to negate evidence that the product was out of specification before reaching Sandstone."

When the case was presented to the jury in the retrial, the jury was instructed that (1) "the specifications that Scott Bader provided to Sandstone for the product during mid–1999 and 2001 were modified"; (2) "[t]he product that was shipped between mid–1999 and 2001 did not meet the specifications Scott Bader provided to Sandstone"; (3) "[s]uch modification of the specifications is a breach of the sales contract between Scott Bader and Sandstone"; and (4) "[s]uch modification is a breach of the warranty from Scott Bader to Sandstone." The first jury question following the binding instructions asked the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Sandstone Products, Inc. for its damages, if any, that resulted from modification of specifications and failure to meet specifications as instructed?" The jury was instructed to consider as elements of damages solely "[t]he reasonable and necessary cost of the repair or replacement of the failed roof coatings"; Sandstone's past lost profits; litigation costs associated with Sandstone's liability to its customers; application fees seeking Dade County, Florida approval for coating material; and costs of property and material testing for roof coating.

### Sanctions Available Under Rule 215

Among the sanctions expressly made available to the trial court under Rule 215 of the Texas Rules of Civil Procedure, governing discovery abuse, are

(1) an order disallowing any further discovery of any kind or of a particular kind by the disobedient party;

(2) an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him;

(3) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(4) an order refusing to allow the disobedient party to support or oppose designated claims or defense, or prohibiting him from introducing designated matters in evidence;

(5) an order striking out pleadings or parts thereof, or ... dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party;

TEX.R. CIV. P. 215.2(b). The rule further provides:

(8) In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him, or both, to pay, at such time as ordered by

the court, the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

*Id.*

### Application of the Test of Abuse of Discretion in Assessing Sanctions

Here, the trial court carefully articulated in its oral and written sanctions orders—issued after notice and hearing—the justification of *each* of its narrowly tailored sanctions. Each sanction was chosen from one expressly permitted by Rule 215.2 to address exactly the behavior the trial court found to have been committed by Scott Bader. There is no evidence in the record that Scott Bader did *not* do exactly what the trial court found it did do, and the majority acknowledges as much. There is no question that Scott Bader's actions constituted severe discovery abuse designed to keep Sandstone from presenting its case. The trial court first entered sanctions directed specifically at prohibiting Scott Bader from profiting from its concealment of documents and of a key witness in the first trial. Nevertheless, Scott Bader continued its misconduct during trial, and a mistrial was declared, so that everyone had to start over. During the second trial, after a hearing outside the presence of the jury, the court issued the written sanctions order at issue on appeal, clarifying its specifically targeted sanctions against Scott Bader, and it instructed the jury accordingly. At no point did the trial court enter "death penalty" sanctions that would have prevented Scott Bader from presenting any defense at all. Sandstone was still obliged to prove its case and its damages.

I would hold that the trial court fully satisfied the first prong of the test for the just impositions of sanctions articulated by the supreme court in *TransAmerican,* namely, the requirement that there be "a direct nexus among the conduct, the offender, and the sanction imposed." *See Spohn Hosp.,* 104 S.W.3d at 882.

The majority, however, does not even discuss the trial court's satisfaction of the first prong of the *TransAmerican* test. Instead, it turns directly to the second prong, which "mandates that the trial court consider less stringent measures before settling on severe sanctions." *Id.* at 883. Ignoring the trial court's targeting of sanctions to address ongoing misconduct and its explanation in the sanctions order for each of the sanctions imposed, the majority finds "conclusory" the trial court's conclusion that it had "considered the possibility of all lesser available options" but "[u]nder these circumstances, ... no lesser sanctions are available to address and deter Defendant SCOTT BADER's conduct while preserving SANDSTONE's rights." *Bader, Wright, Kern & Wooley, L.LP. and National Pigments & Chemicals, Inc. v. Sandstone Products, Inc.,* No. 01–05–00940–CV, 248 S.W.3d 802, 814 (Tex.App.-Houston [1st Dist.] Feb. 28, 2008, no pet. h.). The majority holds that the trial court abused its discretion because this conclusion was "unsupported," and, in a footnote, it offers its own suggestions for sanctions the trial court might have considered. *Bader,* at 814.

In my view, the majority misconstrues the controlling language it quotes from *Cire,* 134 S.W.3d at 842, and it directly contravenes the holding in *Cire,* which is controlling authority. I would find *Cire* to be on all fours with this case with the sole exception that the trial court in *Cire* levied death penalty sanctions for flagrant discov-

ery abuse, while the trial court in this case did not.

In *Cire,* the plaintiff refused to produce audiotapes critical to the proof of her case against the defendant and then deliberately destroyed them after being thrice ordered to produce them. *See id.* at 841. The supreme court observed,

> Because the audiotapes sought by Cire would have either proved or disproved Cummings's claims, her destruction of them justifies a presumption they would have done the latter. On this record, it was within the trial court's discretion to determine that Cummings deliberately destroyed dispositive evidence; thus, death penalty sanctions are warranted in this exceptional case. As we explained in *TransAmerican,* discovery sanctions can be used to adjudicate the merits of a party's claims when a party's hindrance of the discovery process justifies a presumption that its claims lack merit.

*Id.* at 841 (citing *TransAmerican,* 811 S.W.2d at 918). In sum, the supreme court in *Cire* approved death penalty sanctions for behavior virtually identical to that of Scott Bader in this case. Yet in this case, unlike *Cire,* no death penalty sanctions were imposed.

The appellate court's error in reversing the trial court's sanctions order in *Cire,* as described by the supreme court, was exactly the same as the error made by the majority in this case. The supreme court observed in *Cire* that the court of appeals had held that "the trial court abused its discretion when it failed to consider alternative, lesser sanctions and when it did not explain why lesser sanctions would not suffice." *Id.* The supreme court continued, "The court of appeals also said that the trial court could have and should have considered other, lesser sanctions before it imposed death penalty sanctions," but "[the court of appeals] suggested a less

stringent sanction: a spoliation instruction to the jury directing it to assume the missing audiotapes would have been unfavorable to Cummings" and it concluded that the trial court erred by refusing to consider lesser sanctions. *Id.* The supreme court granted the petition for review in *Cire* specifically "to consider the issue of death penalty sanctions and to examine whether a trial court's sanctions order must recite why every conceivable sanction would be ineffective in securing compliance and curing prejudice before striking pleadings." *Id.* at 838.

In reversing the court of appeals, the supreme court held that, in an exceptional case, like that in *Cire,* even death penalty sanctions may be issued without imposing lesser sanctions so long as the trial court "considers" lesser sanctions. *Id.* The court explained:

> Under this standard, the trial court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty; rather, the trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed.

*Id.* at 840.

The trial court in this case did exactly what *Cire* and *TransAmerican* require. It tailored sanctions directly to the abuses perpetuated by Scott Bader and it explained why these sanctions were necessary to cure the specific prejudice to Sandstone caused by each of Scott Bader's abuse. Nevertheless, like the court of appeals in *Cire,* the majority in this case would require the trial court's sanctions order to "recite why every conceivable sanction would be ineffective in securing compliance and curing prejudice" before it would allow the court to the issue targeted sanctions that would impede Scott Bader's

presentation of its case on the issues on which it abused discovery. *See id.* at 838. Because I believe the majority opinion directly contravenes controlling authority, interferes with the jurisdiction of the trial court, and has the effect of rewarding severe discovery abuse with a retrial without the hindrance of sanctions that were fully within the discretion of the trial court to impose, I must dissent.

I would affirm the judgment of the trial court.