Opinion issued February 5, 2009 









     





In The
Court of Appeals
For The
First District of Texas




NO. 01-06-01073-CV




PARA-CHEM SOUTHERN, INC., Appellant

v.

SANDSTONE PRODUCTS, INC., Appellee


* * * * 

SANDSTONE PRODUCTS, INC., Appellant

v.

PARA-CHEM SOUTHERN, INC. AND GOODRICH CORPORATION, 
Appellees




On Appeal from the 127th District Court 
Harris County, Texas
Trial Court Cause No. 2002–27864B




MEMORANDUM OPINION 

          In this products-liability suit brought by Sandstone Products, Inc. (Sandstone)
against Para-Chem Southern, Inc. (Para-Chem) and Goodrich Corporation
(Goodrich), the trial granted summary judgment in favor of Para-Chem and judgment
as a matter of law in favor of Goodrich. The trial court also awarded Sandstone
monetary sanctions against Para-Chem for discovery abuse. Para-Chem and
Sandstone each appeal. 
          Para-Chem presents five issues in which it challenges the trial court’s monetary
sanctions. Sandstone raises two issues attacking the trial court’s rendition of
judgment in favor of Para-Chem and Goodrich.
          We affirm the judgment in part and reverse in part.
Background
          Sandstone manufactures roof sealant coatings. Resin is a component ingredient
in Sandstone’s roof sealant. From 1994 until 2002, Sandstone purchased resin from
Scott Bader, Inc. (Scott Bader) to use in the manufacture of its roof sealant. Scott
Bader provided a formula to Sandstone instructing it how to mix the resin with nine
other ingredients to make Sandstone’s roof sealant. Scott Bader’s resin, known as
“Texigel,” was the component ingredient that caused Sandstone’s roof coating to
“bind” or adhere to roofs. 
          In 1999, Sandstone began receiving complaints from its customers that its roof
sealant was swelling with water and not adhering to roofs. Sandstone ultimately
concluded that Texigel was causing the failure of its roof sealant. Scott Bader denied
the claim, contending that Sandstone was mixing the sealant incorrectly. 
          In 2002, Sandstone sued Scott Bader and its distributor, National Pigment &
Chemicals, Inc. (NPCI). Through the discovery process, Sandstone learned that Scott
Bader did not actually manufacture Texigel; rather, Scott Bader contracted with “toll”
or sub-manufacturers to make the product. The toll manufacturers then placed Scott
Bader’s label on the product. Goodrich was Scott Bader’s toll manufacturer until
1999. At that point, Para-Chem began to make Texigel for Scott Bader. In May
2004, Sandstone added Para-Chem and Goodrich to the lawsuit.
          One of the allegations that Sandstone made against Scott Bader was that Scott
Bader was aware that Texigel deviated from its product specifications. More
precisely, Sandstone charged that Scott Bader was aware that Goodrich, its toll
manufacturer, had at some point deviated from the resin formula of Scott Bader’s
British parent corporation and had started using styrene acrylic instead of pure acrylic
to make Texigel. It is undisputed that Texigel is a styrene acrylic resin not a pure
acrylic resin. Styrene acrylic contains the compound acrylamide, a water absorbent
material, not a water resistant material. For this reason, Sandstone contended that
Texigel was unsuitable for use in commercial roof sealant coatings. 
          Sandstone alleged that Scott Bader was also aware that quality control issues
persisted with Texigel, even after Scott Bader contracted with new toll manufacturer,
Para-Chem. Sandstone asserted that, despite Scott Bader’s awareness of these
problems and its awareness of Sandstone’s customer complaints, Scott Bader never
disclosed this information to Sandstone.
          During litigation, a discovery dispute arose between Scott Bader and
Sandstone. Sandstone filed motions to compel production of information and
documentation regarding product specification and testing, other customer complaints
received by Scott Bader, and the identity of the current or former Scott Bader
employees most knowledgeable regarding product development and formulation
issues. Scott Bader responded that it had produced all testing documents and that it
had no customer complaints, other than those of Sandstone. As supplier and seller,
Scott Bader claimed that it had never been involved in the mixing or formulation of
Texigel. It informed Sandstone that the person with the most knowledge regarding
product formulation was a person who resided in the United Kingdom and was not
a Scott Bader employee. Scott Bader did not reveal the identity of the person.
          From May 2004 until March 2005, Scott Bader produced approximately 200
pages of documents to Sandstone in response to Sandstone’s discovery requests. On
March 1, 2005, Scott Bader produced 8,000 pages of documents to Sandstone. 
Before the production of these documents, Scott Bader and Para-Chem had filed
no-evidence motions for summary judgment against Sandstone. Also by this point,
Sandstone had already taken numerous depositions.
          On August 15, 2005, which was shortly before trial, Sandstone filed a motion
for sanctions against Scott Bader. The principal basis for the motion was that Scott
Bader had failed to timely produce an important, responsive document. On March
1, 2005, as part of the 8,000-page document production, Scott Bader produced, for
the first time, a memorandum authored by Scott Bader employee, David Boothe. The
Boothe memorandum was the first page of a 17-page document. 
          Scott Bader had previously produced the document on July 15, 2004, without
the Boothe memorandum. In that earlier document production, the document’s
second page had a handwritten number “1” on the top, right corner. Thus, page two
appeared to be the document’s first page, rather than its second page. The Boothe
memorandum was correctly produced as the first page of the 17-page document
toward the end of the 8,000-page document production on March 1, 2005. At that
time, Scott Bader did not point out to Sandstone that the document’s actual first page,
i.e., the Boothe memorandum, had been left off when the document was first
produced in July 2004. 
          The Boothe memorandum was written on November 9, 2000 and identifies
concerns associated with Scott Bader’s transition from toll manufacturer Goodrich
to toll manufacturer Para-Chem. The Boothe memorandum stated that Texigel was
manufactured by Goodrich until August of 1999 and that Scott Bader “changed to
Para-Chem at that time to start a closer relationship with the [Para-Chem] folks and
to increase our margins” on Texigel. The Boothe memorandum revealed that, at the
time of the transition, Scott Bader was without a president and that Terry Strickland
(an employee of Scott Bader’s British parent company) was the “main lead” on the
transition from Goodrich to Para-Chem. The Boothe memorandum stated that “our
singular pursuit should be to handle viscosity drift and stability issue.” The
memorandum acknowledges that the “USA formulation” for Texigel differs from the
“UK version” because the “US version contains acrylamide, where the UK version
does not.”
          The memorandum notes that the “UK people” handled the transfer from
Goodrich to Para-Chem and continues, 
There was no control material sent at the time. The lab material was
made and reviewed in the UK and approvals were sent from the UK. 
Once we changed to [Para-Chem], we never went back to [Goodrich]. 
It is now Nov. 2000 and we are reviewing the scale up performed at
[Para-Chem] because we believe we have a slightly different product
due to viscosity drifts and also extra tackiness (as reported from our
customers).
          Sandstone contended that the Boothe memorandum was a “smoking gun”
document because it refuted many of the previous representations made by Scott
Bader during the discovery process. Significantly, at least eight witnesses, including
the memorandum’s author, David Boothe, had already been deposed when Sandstone
had received the Boothe memorandum on March 1, 2005. 
          In addition, Scott Bader produced documents revealing that, at one point, Terry
Strickland had been Scott Bader’s director. Sandstone contended that this was
relevant because it further highlighted the importance of Strickland’s role in the
production of Texigel. Sandstone alleged that Scott Bader should have identified
Strickland as the corporate representative with the most knowledge of formulation
and testing for deposition purposes. 
          Scott Bader also produced customer invoices from which the customer names
and addresses had been redacted by hand. Sandstone asserted that Scott Bader had
redacted the information to prevent Sandstone from identifying other customers that
may have experienced similar problems with Texigel, as referenced in the Boothe
memorandum. Sandstone also pointed out that it had discovered that another Scott
Bader customer, Sealoflex, had complained to Scott Bader about a roofing issue. 
Scott Bader did not produce the documents related to the Sealoflex complaint; rather,
Sandstone had obtained the documents by subpoena directly from Sealoflex.           The trial court granted Sandstone’s request for sanctions following a hearing. 
In its sanctions, order signed on August 22, 2005, the trial court made the following
findings of fact:
a.The Court finds that Defendant SCOTT BADER has knowingly
and in flagrant bad faith engaged in discovery abuse, including
the following:
 
(i)withholding critical responsive documents until the
production of more than 8,000 pages of documents
on March 1, 2005, after the depositions in the
lawsuit had already taken place of witnesses set in
this order [the trial court later identified the
depositions of eight witnesses].
 
(ii)producing documents in a manner calculated to
conceal information (through removing the key first
page of a document and marking out information in
other documents), with conflicting and inadequate
explanations for the same that lack credibility; 
 
(iii)presenting deposition witnesses with such critical
documents and information concealed or not
produced; 
 
(iv)failing to name Terry Strickland as a witness with
knowledge of relevant facts, or to produce
responsive documents, related to Strickland’s role as
director of Defendant SCOTT BADER, his role as
the “main lead” in Defendant SCOTT BADER’s
transition from using Co-Defendant Goodrich[’s]
services to those of Co-Defendant Para-Chem, his
direct supervision over specific issues regarding the
formulation and testing of Defendant’s product, and
his direct involvement in specific issues related to
customer reports of problems.
 
(v)failing to produce as a corporate representative a
witness with knowledge as requested; and 
 
(vi)filing two no-evidence motions for summary
judgment motions on December 10, 2004 and
February 23, 2005, respectively, when Defendant
SCOTT BADER and its counsel knew that the
production of documents and witnesses was
deficient.
 
b.In particular, [the] Court finds that Defendant SCOTT BADER’s
actions were calculated to conceal evidence that would indicate 
 
(i)that SCOTT BADER’s product did not meet its
stated specifications; and 
 
(ii)that the stated specifications were modified.
 
c.The Court further finds that Defendant SCOTT BADER’s actions
and representations to the Court throughout the pretrial discovery
indicate a pattern or history of bad faith discovery abuse,
demonstrate callous disregard for the responsibilities of discovery
under the rules, and significantly interfere with the integrity and
core judicial functions of this Court and its rulings;
 
d.For all of the reasons of [sic] above, the Court finds that
Defendant SCOTT BADER prejudiced Plaintiff SANDSTONE’s
ability to present its case.
          The trial court’s sanctions order further provides, 
The sanctions order below is directly related to the offensive conduct,
and is appropriate and necessary because a lesser sanction will not
promote compliance. The Court has considered the possibility of all
lesser available options. Under these circumstances, however, there is
[sic] no lesser sanctions available to address and deter Defendant
SCOTT BADER’s conduct while preserving SANDSTONE’s rights.
          The trial court awarded the following sanctions to Sandstone:
Plaintiff has requested and shall be entitled to the following jury
instruction, which shall be treated as a partial default judgment limiting
issues in dispute as Defendant Scott Bader, Inc. and its indemnified co-defendant’s pleadings [are] struck to this extent:
 
“You are to presume (1) that the product that was shipped
between mid-1999 and 2001 did not meet the specifications
Scott Bader provided to Sandstone, and (2) that the
specifications that Scott Bader provided to Sandstone for
the product during mid-1999 and 2001 were modified.”
 
Defendant SCOTT BADER and the party it indemnifies [NPCI] shall
not be permitted to rebut the factual presumptions above and any
affirmative defenses addressed to this issue shall be stricken.
          The trial court also ruled that Scott Bader could not use Terry Strickland as a
witness at trial and ordered that Scott Bader “may not use the deposition testimony
of any witness from a deposition unless SCOTT BADER first demonstrates to the
Court that such deposition was taken after full production of documents.” The trial
court then identified eight witnesses that were deposed before Scott Bader’s
“production of critical documents on March 1, 2005.” 
          The trial court further ordered that Scott Bader pay $68,000 in sanctions for
attorney’s fees and expenses incurred by Sandstone attributable to Scott Bader’s
discovery abuse. The trial court also set aside earlier rulings on summary judgments
and struck motions for summary judgment filed after March 1, 2005. 
          The trial court signed an order severing the sanctions orders from the remainder
of the case. The trial court then signed a final judgment in the severed case that
incorporated the sanctions orders, thereby making the sanctions order final for
purposes of appeal. Scott Bader appealed the sanctions order to this Court in
appellate cause number 01–05–00940–CV.
          Goodrich and Para-Chem requested that Sandstone’s claims against them be
tried separately. Goodrich and Para-Chem asserted that they would be unfairly
prejudiced by the sanctions, particularly the jury instruction regarding liability. The
court granted Goodrich’s and Para-Chem’s request. 
          Sandstone tried its claims against Scott Bader in September 2005. Pursuant to
the earlier sanctions order, the trial court instructed the jury as follows: 
BINDING INSTRUCTIONS
The following instructions are binding on the jury.
You are given these binding instructions by the Court for all purposes
in this Charge and to govern your deliberations and answers to the Jury
Questions.
 
The Jury is instructed that:
 
(1)The specifications that Scott Bader provided to Sandstone for the
product during mid-1999 and 2001 were modified.
 
(2)The product that was shipped between mid-1999 and 2001 did not
meet the specifications Scott Bader provided to Sandstone.
 
These instructions are also binding instructions. You are further
instructed that:
 
Modification of Specifications
 
Such modification of the specifications is a breach of the sales contract
between Scott Bader and Sandstone. 
 
Such modification is a breach of the warranty from Scott Bader to
Sandstone.
 
Failure to Meet Specifications
 
Such failure to meet specifications is a breach of the sales contract
between Scott Bader and Sandstone. 
 
Such [failure to meet specifications] is a breach of the warranty from
Scott Bader to Sandstone.
          The first jury question following the binding instructions asked the jury, “What
sum of money, if any, if paid now in cash, would fairly and reasonably compensate
Sandstone Products, Inc. for its damages, if any, that resulted from modification of
specifications and failure to meet specifications as instructed?” In response to this
question, the jury awarded Scott Bader a total of $3,375,000 in actual damages. 
          The next four questions pertained to Sandstone’s DTPA claim. In addition to
the actual damages awarded in the first jury question, the jury awarded $950,000,
$225,000, and $25,000 for each of Scott Bader’s knowing violations of the DTPA.
          The jury further found that Scott Bader had committed fraud and negligent
misrepresentation. With regard to these claims, the jury awarded Sandstone $300,000
for the reasonable and necessary cost of the repair or replacement of the failed roof
coatings and $30,000 for Sandstone’s past lost profits. Lastly, the jury awarded
Sandstone $486,000 for attorney’s fees. 
          The trial court rendered judgment in the “A” case awarding Sandstone the
actual damages found by the jury in Question Number 1, totaling $3,375,000, the
$950,000 in additional damages awarded for Scott Bader’s knowing DTPA violation,
and $486,000 for attorney’s fees. The trial court also awarded $903,667 in pre-judgement interest. Scott Bader appealed the trial court’s judgment in appellate cause
number 01–06–00593–CV. 
          The trial court then severed Sandstone’s claims against Goodrich and Para-Chem. The severed “B” case against Para-Chem and Goodrich proceeded toward
trial, with additional discovery being conducted. 
          On February 28, 2006, Sandstone filed a motion for sanctions against Para-Chem. Sandstone alleged that Para-Chem had colluded with Scott Bader to obfuscate
the discovery process and, more precisely, to conceal the Boothe memorandum. 
Sandstone asserted that it had uncovered Para-Chem’s complicity following the Scott
Bader trial. Sandstone argued that, like Scott Bader, Para-Chem had filed no-evidence motions for summary judgment despite knowing that certain responsive,
case-determinative documentation had been withheld from Sandstone. 
          Sandstone further asserted that Para-Chem had misled the trial court when
Para-Chem requested to be tried separately from Scott Bader. In its motion for a
separate trial, Para-Chem had asserted that it was innocent of discovery abuse and
would be unfairly penalized if it were tried with Scott Bader and subject to the same
adverse jury instructions as Scott Bader. 
          On April 6, 2006, Para-Chem filed its third motion for summary judgment
against Sandstone. Ultimately, the trial granted summary judgment in Para-Chem’s
favor and judgment as a matter of law in Goodrich’s favor. 
          The trial court further determined that Para-Chem should be sanctioned for
discovery abuse. The trial court signed a sanctions order against Para-Chem on
August 21, 2006. The sanctions order provides, in part, as follows:
Scott Bader resisted and concealed highly relevant discovery
including Para-Chem’s role and involvement in the production of the
product in question. Court intervention was necessary to obtain
compliance with valid pre-trial discovery requests to Scott Bader
including orders to require disclosure and discovery of documents, to
require the identification of persons with knowledge of relevant
information, and take the depositions of vital witnesses with personal
knowledge, even to require the disclosure of Para-Chem as the “toll
manufacturer” of the product in question. All that could be done to
hinder discovery was done.
 
Para-Chem resisted and concealed highly relevant discovery of the role
of Scott Bader and its own role in the production of the product in
question. Discovery from Para-Chem was crucial to proof of the facts
in the underlying case against Scott Bader. Para-Chem first worked to
conceal documents ordered to be produced, and when such concealment
became apparent, Para-Chem embarked on a course to obscure its
obstructive conduct.
 
Discovery from the defendants was crucial to seeking the true facts and
circumstances in this dispute. Plaintiff [Sandstone] was entitled to such
discovery under the Rules of Civil Procedure. 
 
. . . .
 
The Court finds that the discovery directed by [Sandstone] to Para-Chem
was relevant to the claims of [Sandstone] against Scott Bader, the
principal of Para-Chem, which was the agent of Scott Bader to produce
the product in question. 
 
From the discovery documented by [Sandstone], the Court finds that
Para-Chem was not forthright with the Court involving failure to
produce relevant information. The Court finds that Defendant Para-Chem knowingly was involved in the activities that led to the sanctions
levied against Scott Bader in the underlying case. The Court finds that
Defendant Para-Chem intentionally failed to accurately respond to
document production and to requests to identify persons with knowledge
of relevant facts. If the accurate facts had been disclosed to the Court,
discovery sanctions against Defendant Scott Bader would have included
Defendant Para-Chem; a separate trial would not have been granted
Defendant Para-Chem; and [Sandstone’s] discovery costs since the
granting of the separate trial would have been minimized.
 
This lack of forthrightness and failure to fully respond continued in this
separate trial granted when the Court did not have knowledge of Para-Chem’s involvement and allowed the claims against Para-Chem to
continue at added, needless expense. 
 
[Sandstone’s] motions for sanctions against Defendant Para-Chem are
granted. The Court is mindful that a sanction for discovery abuse should
be tailored to the harm resulting. The Court’s analysis of the cause
against Defendant Para-Chem as the undisclosed agent of Scott Bader,
Inc. will result in a take nothing judgment in favor or Defendant Para-Chem on the basis of the legal issues involved, thereby rendering the
factual dispute as to defective nature of Para-Chem’s product immaterial
to liability of Para-Chem. The Court declines to levy any sanctions that
would alter the proper ruling on the legal basis of the claim. That leaves
the troubling issue of how to address the serious violation found against
a party which knowingly participated in a scheme to block the opposing
party’s acquisition of damaging discovery. 
 
The Court finds a sanctions assessment of $250,000 against Para-Chem.
 
Finding that Para-Chem was knowingly involved in the discovery abuse
prior to the Scott Bader, Inc. trial, [the] Court rules that this pattern of
abuse should be met with a judgment that Para-Chem is jointly and
severally liable with Scott Bader, Inc. for the amount of $68,000, the
attorney’s fees and expenses that the Court was able to segregate at the
time of the discovery of the original discovery abuse. . . . 
 
In addition, due to the actions in electing a separate trial, [Sandstone]
needlessly incurred extensive attorney’s fees. [Sandstone] shall be
awarded its attorney’s fees incurred in this “B” suit which the Court
finds to be $375,000 through trial and appellate fees of $70,000 in the
Court of Appeals, $40,000 if a Petition for Review is filed in the
Supreme Court, and $30,000 if the Petition is granted. All costs for the
severance and all costs for depositions taken in this severed cause are
taxed against Defendant Para-Chem, including any costs incurred by
Defendant Goodrich Corporation. 
          The trial court signed its final judgment in the “B” case on August 22, 2006,
incorporating the sanctions order against Para-Chem and the trial court’s rulings that
Para-Chem and Goodrich were entitled to judgment, as a matter of law, regarding
Sandstone’s claims. Both Para-Chem and Sandstone appealed the trial court’s
judgment.
          On February 28, 2008, we issued our opinion in appellate cause number
01–05–00940–CV (Scott Bader’s appeal of the sanctions order against it) and in
01–06–00593–CV (Scott Bader’s appeal of the judgment in the “A” case awarding
Sandstone damages against Scott Bader). In the sanctions appeal, we reversed the
sanctions order in part and remanded and affirmed it in part.


 We concluded that the
trial court did not abuse its discretion by finding that Scott Bader had engaged in
sanctionable conduct during the discovery process.


 We affirmed the sanctions order
with regard to the $68,000 in sanctions for attorney’s fees attributable to Scott
Bader’s discovery abuse. 
          With regard to the portions of the sanctions order (1) requiring the jury to be
instructed that Scott Bader’s product did not meet specifications and that product
specifications provided by Scott Bader to Sandstone had been modified, (2)
prohibiting Scott Bader from rebutting these presumptions, and (3) striking Scott
Bader’s affirmative defenses addressed to this issue, we concluded that the trial court
abused its discretion because it had not first considered the imposition of lesser
sanctions.


 We reversed the order with respect to those sanctions and remanded to
the trial court for further proceedings.


 
          In Scott Bader’s appeal of the money judgment, we concluded that the
improper sanctions ordered by the trial court affected and shaped the presentation and
development of the “A” case at trial, for both Sandstone and Scott Bader.


 For this
reason, we reversed the money judgment against Scott Bader and remanded the case
for further proceedings.


 
Para-Chem’s Sanctions Appeal
          Raising five issues, Para-Chem challenges the trial court’s assessment of
monetary sanctions against it. As reflected in the August 21, 2006 sanctions order,
the trial court sanctioned Para-Chem for aiding Scott Bader in obstructing the
discovery process and for itself failing to accurately respond to requests for document
production and to requests for the identity of persons with knowledge of relevant
facts. 
A.      Standard of Review and Governing Principles
          We review a trial court’s ruling on a motion for sanctions under an abuse of
discretion standard. Cire v. Cummings, 134 S.W.3d 835, 838 (Tex. 2004). A trial
court abuses its discretion when its ruling is arbitrary and unreasonable without
reference to any guiding rules and principles. Id. at 838–39. In conducting our
review, we are not limited to a review of the “sufficiency of the evidence” to support
the trial court’s findings; rather, we make an independent inquiry of the entire record
to determine if the court abused its discretion by imposing the sanction. Daniel v.
Kelley Oil Corp., 981 S.W.2d 230, 234 (Tex. App.—Houston [1st Dist.] 1998, pet.
denied) (op. on reh’g).
          Rule of Civil Procedure 215.2 allows a trial court to enter “just” sanctions for
a party’s failure to comply with a discovery order or request. Tex. R. Civ. P. 215.2. 
The Supreme Court of Texas in TransAmerican Natural Gas Corp. v. Powell
developed a two-part test for courts to apply when determining whether a sanction is
“just.” 811 S.W.2d 913, 917 (Tex. 1991). First, there must be a direct nexus among
the offensive conduct, the offender, and the sanction imposed. Spohn Hosp. v.
Mayer, 104 S.W.3d 878, 882 (Tex. 2003) (citing TransAmerican, 811 S.W.2d at 917). 
A just sanction must be directed against the abuse and toward remedying the
prejudice caused to the innocent party, and the sanction should be visited upon the
offender. Id.
          Second, just sanctions must not be excessive. TransAmerican, 811 S.W.2d at
917. That is, a sanction imposed for discovery abuse should be no more severe than
necessary to satisfy its legitimate purposes, which includes securing compliance with
discovery rules, deterring other litigants from similar misconduct, and punishing
violators. Id.; see Spohn Hosp., 104 S.W.3d at 882; Chrysler Corp. v. Blackmon, 841
S.W.2d 844, 849 (Tex. 1992). For this reason, the supreme court requires courts to
consider less stringent sanctions and whether such lesser sanctions would fully
promote compliance. TransAmerican, 811 S.W.2d at 917; see Cire, 134 S.W.3d at
839; Spohn Hosp., 104 S.W.3d at 882.
B.      The Sanctionable Conduct 
          In its first issue, Para-Chem contends that, because Scott Bader’s conduct with
respect to discovery was not sanctionable, Para-Chem cannot be sanctioned for aiding
or colluding with Scott Bader.


 Para-Chem’s briefing in this appeal was filed before
we issued our opinion in Scott Bader’s sanctions appeal. In our opinion, we
concluded that the trial court had not abused its discretion with regard to finding that
Scott Bader had engaged in sanctionable conduct. Scott Bader, Inc. v. Sandstone
Products, Inc., 248 S.W.3d 802, 812–14 (Tex. App.—Houston [1st Dist.] 2008, no
pet.). Of particular relevance to the trial court’s sanctions order against Para-Chem,
we concluded that the record supported the trial court’s finding that Scott Bader
abused the discovery process regarding the production of the Boothe memorandum
and the disclosure of Terry Strickland’s identity and role. Id. The opinion discusses
the significance of the Boothe memorandum and the misleading way in which Scott
Bader initially produced the 17-page document without the Boothe memorandum. 
Id. at 813–14. The opinion also makes clear that the untimely production of the
Boothe memorandum is sanctionable conduct despite the fact that it was produced
five months before trial. See id. at 814. The opinion notes that at least eight
witnesses, including the memorandum’s author, David Boothe, were deposed before
Sandstone received the memorandum. Id. As such, Scott Bader’s discovery caused
Sandstone to incur attorney’s fees and other expenses.
          Our earlier decision determining that the trial court did not abuse its discretion
by finding that Scott Bader engaged in sanctionable discovery abuse is sound and
supported by the record. Here, Para-Chem presents no new arguments regarding why
Scott Bader’s conduct was not sanctionable. Thus, we will not revisit that
determination.
          We overrule Para-Chem’s first issue to the extent that it challenges the
propriety of the trial court’s finding that Scott Bader engaged in sanctionable conduct,
which the trial court imputed to Para-Chem.
C.      Propriety of Sanctions  
          In its fifth issue, Para-Chem contends that each of the monetary sanctions
assessed was excessive or “legally improper.” 
          1.       $375,000 Attorney’s Fees Sanction
          The trial court assessed a $375,000 sanction against Para-Chem, which
represents the total attorney’s fees Sandstone claimed that it incurred in prosecuting
the “B” suit against Para-Chem and Goodrich. Sandstone supported the amount of
its attorney’s fees with affidavits of two of its attorneys. The attorneys averred that
$375,000 was the amount of fees Sandstone incurred since the conclusion of the Scott
Bader trial on October 11, 2005 until the “B” suit was called to trial on May 15, 2006. 
          In its order, the trial court supported the sanction by reasoning that, because
Para-Chem elected a separate trial from Scott Bader, Sandstone “needlessly incurred
extensive attorney’s fees.” The trial court also stated in its order that, had it known
of Para-Chem’s sanctionable conduct before the Scott Bader trial, it never would have
granted Para-Chem a separate trial; rather, it would have required Para-Chem to be
tried with Scott Bader. 
          Courts may award attorney’s fees as a sanction for violations of the discovery
process. See Tex. R. Civ. P. 215.2(b)(8); Brantley v. Etter, 677 S.W.2d 503, 504
(Tex. 1984); City of Colleyville v. Powell, 846 S.W.2d 126, 128 (Tex. App.—Fort
Worth 1993, writ denied). Nonetheless, a court abuses its discretion when there is no
reasonable relationship between the harm done and the sanction assessed. Bradt v.
Sebek, 14 S.W.3d 756, 761 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). A
just sanction must be directed against the abuse and toward remedying the prejudice
created against the innocent party. Transamerican, 811 S.W.2d at 917. A sanction
is excessive if the punishment does not fit the crime. Id. 
          Here, the $375,000 attorney’s fees sanction lack a reasonable relationship to
the harm done by the cited discovery abuse. In its order, the trial court reasoned that,
had it known of Para-Chem’s participation in the discovery abuse before the Scott
Bader trial, it would have required Para-Chem to have been tried with Scott Bader
and presumably would have been subject to the same adverse jury instruction
regarding liability. This reasoning, however, cannot be reconciled with the trial
court’s ultimate determination that Sandstone was not entitled to a trial against Para-Chem, as a matter of law; rather, Para-Chem was entitled to summary judgment.
          The $375,000 attorney’s fees sanction was also excessive for remedying the
prejudice caused, if any, to Sandstone. As pointed out by Para-Chem, Sandstone
would have incurred attorney’s fees in prosecuting its suit against Goodrich
regardless of whether the trial court had denied Para-Chem’s request for a separate
trial. Any attorney’s fees awarded as a sanction should have been limited to those
fees attributable to the harm or prejudice caused by Para-Chem’s sanctionable
conduct. The amount awarded necessarily exceeds this amount. Sandstone neither
presented evidence of only those fees attributable to Para-Chem’s conduct nor made
a showing why such fees could not be segregated. 
          In short, the record does not support the trial court’s $375,000 sanction. 
Accordingly, the trial court abused its discretion by awarding the $375,000 in
attorney’s fees sanction. 
          2.       Appellate Fees as Sanctions
          Para-Chem also challenges the sanctions directing Para-Chem to pay “appellate
fees of $70,000 in the Court of Appeals, $40,000 if a Petition for Review is filed in
the Supreme Court, and $30,000 if the Petition is granted.” Para-Chem asserts that
the sanctions are not permitted. We agree. 
          “[A]lthough a trial court may grant appellate attorney’s fees as part of a
sanctions order under Rule 215, the court must condition the award on the outcome
of the appeal.” In re Ford Motor Co., 988 S.W.2d 714, 721 (Tex. 1998). Rule 215
only allows the shifting of appellate costs to the party seeking review of the trial
court’s order when that party does not succeed on appeal. Id. Permitting an
unconditional award of appellate fees would deter a party from seeking appellate
review and unjustly penalize a party for seeking such relief. See id. 
          In this case, the trial court did not condition the award of appellate costs on the
outcome of the appeal process. The sanction in no manner related to the harm
suffered as a result of the Para-Chem’s discovery abuse and served only to improperly
deter Para-Chem from seeking review of the sanctions order. See id. We hold that
the trial court abused its discretion by awarding appellate costs without conditioning
the award on the outcome of the appellate process. See id.
 
          3.       $250,000 Penalty
          Para-Chem challenges the trial court’s award of $250,000 as a sanction against
it. Para-Chem asserts that the award is “arbitrary and capricious.” 
          The sanctions order reflects that the trial court was troubled with regard to what
sanctions it could assess against Para-Chem in light of the trial court’s determination
that Para-Chem was entitled to a take-nothing judgment against Sandstone, as a
matter of law. As a solution, the trial court assessed what is essentially a $250,000
fine or penalty. 
          The record does not reveal how the trial court arrived at the amount of the
$250,000 sanction levied against Para-Chem nor does it contain evidentiary support
for the $250,000 sanction. When a monetary sanction is imposed, the sanctionable
conduct alone does not prescribe the amount of the sanction. Stromberger v. Turley
Law Firm, 251 S.W.3d 225, 227 (Tex. App.—Dallas 2008, no pet.). “To review the
decision of the amount of the monetary sanction imposed by examining only the
conduct giving rise to the sanction would permit a ‘wavering standard of subjectivity’
unrestrained by law or statute.” Id. 
          In short, arbitrary fines, such as the $250,000 sanction in this case, are not
susceptible to meaningful review. See id. at 226–27. We can determine no reason
why the trial court chose to impose a $250,000 sanction rather than some other
amount. Without supporting evidence or an explanation regarding the basis of the
trial court’s award, we cannot determine whether the $250,000 sanction is just or
excessive.


 See id. at 227; see also IFC Credit Corp. v. Specialty Optical Systems,
Inc., 252 S.W.3d 761, 773 (Tex. App.—Dallas 2008, pet. filed). We conclude that
the trial court abused its discretion by awarding Sandstone $250,000 in sanctions
against Para-Chem. See Stromberger, 251 S.W.3d at 227.
          4.       $68,000 Sanction
          Para-Chem also challenges the trial court’s order that “Para-Chem is jointly and
severally liable with Scott Bader, Inc. for the amount of $68,000, the attorney’s fees
and expenses that the Court was able to segregate at the time of the discovery of the
original discovery abuse.” Para-Chem contends that the affidavit of Sandstone’s
attorney, which provided that Sandstone incurred $68,000 in attorney’s fees to
address Scott Bader’s discovery abuse, was conclusory and constituted insufficient
evidence to support the award. Para-Chem asserts that Sandstone failed to show that
the attorney’s fees were reasonable and necessary. Scott Bader made these same
assertions in its appeal of the $68,0000 sanction. Scott Bader, 248 S.W.3d at 816–17. 
          There, we recognized that “[i]n cases in which the judgment is not one for
earned attorney’s fees, but rather a judgment imposing attorney’s fees as sanctions,
it is not invalid because a party fails to prove attorney’s fees.” Id. at 816. “When
attorney’s fees are assessed as sanctions, no proof of necessity or reasonableness is
required.” Id. at 817 (quoting Miller v. Armogida, 877 S.W.2d 361, 365 (Tex.
App.—Houston [1st Dist.] 1994, writ denied)). We concluded that “by focusing on
the lack of evidentiary value of [the attorney’s] affidavit to prove the reasonableness
and necessity attorney’s fees actually earned by Sandstone’s attorneys, Sandstone has
not demonstrated that the trial court abused its discretion when it awarded $68,000
in attorney’s fees as sanctions.” Id. 
          We further noted that, in addition to the attorney’s affidavit, the record
indicated “that much of Sandstone’s attorney time was affected by the sanctionable
conduct.” Id. For example, “[a]t least eight depositions were taken by Sandstone in
locations across the United States without the benefit of the Boothe memorandum.” 
Id. And, “the record reflect[ed] that Sandstone’s counsel prepared two motions to
compel discovery and engaged in communications with Scott Bader’s counsel over
a substantial period in an attempt to obtain discoverable information.” Id.
          We concluded that “Scott Bader has not shown that the trial court abused its
discretion by awarding $68,000 in attorney’s fees and expenses as sanctions.” Id. 
For the reasons discussed in the Scott Bader opinion, we similarly conclude here that
Para-Chem has not shown that the trial court abused its discretion by ordering that
Para-Chem is jointly and severally liable with Scott Bader for $68,000 in attorney’s
fees and expenses.


 
          5.       Conclusion Regarding Sanctions
          On this record, the only sanction shown to be allocable to Para-Chem’s
wrongful conduct cited in the trial court’s August 21, 2006 order and supported by
sufficient evidence is the $68,000 sanction for which Para-Chem is jointly and
severally liable. Sandstone neither showed that the $375,000 attorney’s fees sanction
is allocable to the wrongful conduct cited in the sanctions order nor that the $375,000
sanction is not excessive. Regarding the $250,000 sanction, Sandstone failed to offer
proper evidentiary support for this award. 
          We hold that the trial court abused its discretion with regard to assessing the
$375,000 attorney’s fees sanction and $250,000 sanction. We reverse the judgment
with respect to these sanctions and render judgment that appellant takes nothing with
regard to the $375,000 attorney’s fees sanction and $250,000 sanction. 
          The trial court did not properly condition the appellate fee sanction on the
outcome of Para-Chem’s appeal. For this reason, we hold that the trial court abused
its discretion by awarding appellate fees as sanctions. We reverse the trial court’s
judgment with respect to the appellate fee sanctions and render that Sandstone take
nothing with respect to them.


 
          As discussed, we sustain Para-Chem’s fifth issue in part and overrule it in
part.


 
Sandstone’s Appeal
          In its appeal, Sandstone challenges the trial court’s summary judgment in favor
of Para-Chem and the trial court’s rendition of judgment in favor of Goodrich at the
Rule 166 pretrial conference. 
A.      Summary Judgment in Favor of Para-Chem 
          In its fifth amended petition, Sandstone alleged that the Texigel resin made by
toll manufacturers Para-Chem and Goodrich “had substandard adhesive qualities,
which resulted in deterioration, resulting in numerous warranty and liability claims
against Sandstone [by its customers].” Sandstone sued Para-Chem and Goodrich for
breach of implied warranty of merchantability and breach of implied warranty of
fitness for a particular purpose. Para-Chem also asserted a Deceptive Trade Practices
Act Claim (DTPA) claim based on its breach of warranty claims. Para-Chem moved
for traditional summary judgment, which was granted by the trial court.
          1.       Standard of Review
          The movant for traditional summary judgment must show that there is no
genuine issue of material fact and that it is entitled to judgment as a matter of law.
Tex. R. Civ. P. 166a(c); Nixon v. Mr. Property Management Co., Inc., 690 S.W.2d
546, 548 (Tex. 1985). A defendant moving for traditional summary judgment must
conclusively negate at least one essential element of each of the plaintiff’s causes of
action. Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002). Evidence is
conclusive only if reasonable people could not differ in their conclusions. City of
Keller v. Wilson, 168 S.W.3d 802, 816 (Tex. 2005). Once the defendant establishes
its right to summary judgment as a matter of law, the burden shifts to the plaintiff to
present evidence raising a genuine issue of material fact, thereby precluding summary
judgment. City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678–79
(Tex. 1979). 
          We review a trial court’s grant of a traditional summary judgment de novo. See
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003). When
reviewing a traditional summary judgment, we take as true all evidence favorable to
the nonmovant, and we indulge every reasonable inference and resolve any doubts
in the nonmovant’s favor. Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150,
157 (Tex. 2004).
          2.       Breach of Implied Warranty of Merchantability
          A plaintiff asserting a breach of implied warranty of merchantability claim
must show as follows: (1) that the product was defective as unfit for its purpose
because of a lack of what was required for adequacy; (2) that the alleged defect
existed when the product left the defendant’s possession; and (3) that the alleged
defect proximately caused the injuries for which plaintiff seeks damages. See
Roventini v. Ocular Scis., Inc., 111 S.W.3d 719, 723 (Tex. App.—Houston [1st Dist.]
2003, no pet.) (citing Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 444 (Tex.
1989) and Harris Packaging Corp. v. Baker Concrete Constr. Co., 982 S.W.2d 62,
66 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)); see also Tex. Bus. & Com.
Code. Ann. § 2.314 (Vernon 1994).
          In the context of an implied warranty of merchantability case, the word
“defect” means a condition of the goods that renders them unfit for the ordinary
purposes for which they are used because of a lack of something necessary for
adequacy. Plas-Tex, 772 S.W.2d at 444. Sandstone alleged that the ordinary purpose
of Texigel was to serve as an adhesive. Sandstone asserted that the Texigel produced
by Para-Chem was defective because it had “substandard adhesive qualities.” 
Sandstone alleged that the defect resulted from Para-Chem’s failure to follow the
specifications for manufacturing Texigel provided by Scott Bader. 
          In its motion for summary judgment Para-Chem asserted, “Sandstone’s claim
for breach of implied warranty of merchantability fails because there is no evidence
that any resin manufactured by Para-Chem and actually delivered to Sandstone was
ever off-spec, or in any way substandard.” To support this assertion, Para-Chem
offered the affidavit of Jeffrey Ellis, Para-Chem’s marketing director. In his affidavit,
Ellis acknowledges that Para-Chem produced out-of-specification Texigel. But Ellis
avers in his affidavit that, after his review of Para-Chem’s quality control and
shipping records, “none of the out of specification Texigel 13-034 manufactured by
Para-Chem for Scott Bader . . . was ever shipped to Scott Bader.” Ellis further
explains, “In the event a lot [of Texigel] was produced, which was out of
specification, the lot was either rejected and destroyed or was re-worked into a lot
that met all of Scott Bader’s specifications before it was approved [and] shipped to
Scott Bader.” 
          On appeal, Sandstone contends that the motion for summary judgment should
have been denied because the Ellis affidavit “is blatantly and substantively defective
and should not be considered in evidence.” Sandstone bases this assertion on Para-Chem’s failure to attach “the underlying manufacturing and shipping records”
referenced by Ellis. 
          We have previously concluded that a party’s failure to attach documents
referenced in an affidavit is a defect in form, not a defect in substance.


 Mathis v.
Bocell, 982 S.W.2d 52, 60 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Sandstone
filed a written objection in the trial court protesting Para-Chem’s failure to attach the
referenced records to Ellis’s affidavit. However, the record does not reflect that
Sandstone obtained a ruling on its objection. When, as here, an objection is to the
form, not the substance, of an affidavit, failure to obtain a ruling waives the objection. 
See Harris v. Spires Council of Co-Owners, 981 S.W.2d 892, 897 (Tex.
App.—Houston [1st Dist.] 1998, no pet.); see also Tex. R. App. P. 33.1. Thus, we
may consider the Ellis affidavit, which we conclude negates conclusively the second
element of Sandstone’s claim: that the defect existed when it left Para-Chem’s
possession. 
          Sandstone contends that it provided clear and uncontroverted evidence that
“out of specification product” was shipped by Para-Chem. We disagree. Although
the evidence cited by Sandstone indicates that Para-Chem produced out-of-specification Texigel, as acknowledged by Ellis, the cited evidence does not show
that the out-of-specification Texigel was shipped to Scott Bader. 
          In sum, Para-Chem successfully negated the second element of Sandstone’s
breach of implied warranty of merchantability claim. Viewing all evidence favorable
to Sandstone as true and indulging every reasonable inference in it favor, Sandstone
has not met its summary judgment burden to present evidence raising a genuine issue
of material fact regarding the second element. We conclude that Para-Chem is
entitled to summary judgment as a matter of law on Sandstone’s breach of implied
warranty of merchantability claim. We hold that the trial court properly granted
summary judgment on this claim. 
          3.       Breach of Implied Warranty of Fitness for a Particular Purpose
          To establish a breach of the implied warranty of fitness for a particular purpose,
the plaintiff must establish that (1) the seller had reason to know any particular
purpose for which the goods were required at the time of contracting and (2) the
buyer was relying on the seller’s skill or judgment to select or furnish suitable goods.
Tex. Bus. & Com. Code. Ann. § 2.315 (Vernon 1994); ASAI v. Vanco Insulation
Abatement Inc., 932 S.W.2d 118, 121 (Tex. App.—El Paso 1996, no writ) (affirming
trial court’s finding that buyer failed to establish elements of an implied warranty of
fitness for a particular purpose). Here, Sandstone alleges that Para-Chem “knew or
reasonably should have known of Sandstone’s particular purpose for purchasing the
products, i.e., for use as a binder in a commercial grade roof coating.” 
          In support of its motion for summary judgment, Para-Chem attached
Sandstone’s fifth amended petition in which Sandstone alleged that it did not become
aware that Para-Chem, rather than Scott Bader, was the “true manufacturer” of
Texigel until “after problems began to occur” with its customer’s roofs. 
          Para-Chem also attached Sandstone’s answers to interrogatories in which it
identified Scott Bader as the only party that made representations to Sandstone
regarding Texigel. In addition, Para-Chem offered the deposition testimony of
Sandstone’s owner, Benny Stegall, who testified that he never spoke or corresponded
with anyone from Para-Chem.
          We agree with Para-Chem that its summary judgment evidence negates the
second element of Sandstone’s claim for breach of implied warranty of fitness,
namely, that Sandstone relied on the Para-Chem’s skill or judgment to select or
furnish suitable resin to use as a binder in commercial grade roofing sealant. In
response, Sandstone offered no evidence to show that it relied on Para-Chem’s skill
or judgment to select Texigel for use in the manufacture of its commercial grade roof
sealant. 
          Related to this element, Sandstone does assert, “[T]o require Sandstone to
actually know the manufacturer would be to require privity between the two parties,
which [the] court found to be unnecessary in Nobility Homes of Texas, Inc. v. Shivers,
557 S.W.2d 77, 80–81 (Tex. 1977).” Nobility Homes is inapposite to this issue. The
claim involved in Nobility Homes was breach of implied warranty of merchantability. 
Id. at 80. There was no claim for breach of implied warranty of fitness for a particular
purpose, as here. At issue in Nobility Homes was whether a manufacturer impliedly
warrants the merchantability of a mobile home to a purchaser with whom it is not in
privity. Id. at 78. The supreme court held in the affirmative. Id. Nobility Homes
does not stand for the proposition that a plaintiff asserting breach of implied warranty
of fitness for a particular purpose against a defendant, with whom it is not in privity,
need not show that it relied on the defendant seller’s skill or judgment to select or
furnish suitable goods. 
          Para-Chem successfully negated the second element of Sandstone’s breach of
implied warranty of fitness for a particular purpose claim. Viewing all evidence
favorable to Sandstone as true and indulging every reasonable inference in it favor,
Sandstone has not met its summary judgment burden to present evidence raising a
genuine issue of material fact regarding the second element. We hold that Para-Chem
is entitled to summary judgment as a matter of law on Sandstone’s breach of implied
warranty of fitness for a particular purpose claim, and the trial court properly granted
summary judgment in that regard.


 
          4.       DTPA Claims
          DTPA section 17.50(a)(2) permits a consumer to maintain a DTPA action when
a breach of an express or implied warranty is a producing cause of the consumer’s
economic or mental anguish damages. Tex. Bus. & Com. Code Ann. § 17.50(a)
(Vernon Supp. 2008). Sandstone brought a DTPA claim against Para-Chem based
on Sandstone’s claim that Para-Chem breached implied warranties. Because Para-Chem successfully challenged Sandstone’s breach of implied warranty claims, on
which its DTPA claim is based, Para-Chem is also entitled to summary judgment on
Sandstone’s DTPA claim.


 See Mott v. Red’s Safe And Lock Services, Inc., 249
S.W.3d 90, 98 ((Tex. App.—Houston [1st Dist.] 2007, no pet.).
          We overrule Sandstone’s first issue.
B.      Take-Nothing Judgment in Favor of Goodrich 
          In its second issue, Sandstone challenges the trial court’s determination that
Goodrich was entitled to judgment against Sandstone as a matter of law.
          On the first day scheduled for trial, the trial court held a Rule 166 pretrial
conference. At the conference, the trial court stated that it had determined that no
issues of fact remained for the jury and that Goodrich was entitled to a “directed
verdict” against Sandstone. The trial court based its ruling on its conclusion that a
toll manufacturer, such as Goodrich, cannot be liable, as a matter of law, to a
downstream purchaser for breach of implied warranty.


 
          1.       Standard of Review and Relevant Procedural Principles
          The purpose of Rule 166 is “to assist in the disposition of the case without
undue expense or burden to the parties.” Tex. R. Civ. P. 166. A trial court may
summarily dispose of issues at a Rule 166 pretrial conference when the trial court
determines that no fact issues remain and the issues may be determined as a matter
of law. See Walden v. Affiliated Computer Services, Inc., 97 S.W.3d 303, 323 (Tex.
App.—Houston [14th Dist.] 2003, pet. denied). 
          On appeal, Sandstone challenges the trial court’s determination that Goodrich
is entitled to judgment as a matter of law. We review Sandstone’s challenge by the
same standard used to review a directed verdict. See id. at 324. 
          A directed verdict in favor of a defendant is proper when the plaintiff does not
present evidence that raises a fact issue essential to the plaintiff’s right of recovery,
or when the plaintiff admits or the evidence conclusively establishes a defense to the
plaintiff’s cause of action. Prudential Ins. Co. v. Fin. Rev. Servs. Inc., 29 S.W.3d 74,
77 (Tex. 2000). In reviewing a directed verdict, the standards are the same as a legal
sufficiency challenge. Keller, 168 S.W.3d at 823. We must credit favorable evidence
if reasonable jurors could and disregard contrary evidence unless reasonable jurors
could not. See id. at 827.
          2.       Liability for Breach of Implied Warranties 
          Each side relies on PPG Indus., Inc. v. JMB/Houston Ctrs. Partners L.P., 146
S.W.3d 79 (Tex. 2004) to support its respective position. As it did in Nobility Homes,
the supreme court recognized in PPG that a downstream consumer can assert a breach
of implied warranty claim against a remote manufacturer, even though there is no
privity of contract between them. Id. at 88 (citing Nobility Homes, 557 S.W.2d at 81). 
The PPG court explained that warranty claims pass with the underlying goods and are
assignable to the subsequent purchaser. Id. at 89.
          Goodrich asserts that under the reasoning in PPG, it cannot be liable for
implied warranties. Goodrich contends that it is not a “remote manufacturer ” as
referenced in PPG. Rather, it is a “toll manufacturer.” Goodrich asserts that the
distinction is significant. In its brief, Goodrich explains its position as follows:
A “toll manufacturer” is a contract manufacturer or processor of a
chemical intermediate or finished product that provides a manufacturing
service under specific terms of a contract. . . . 
 
Toll contractors typically specify the technology to be used, set
performance standards and product quality criteria, utilize their own
labeling and packaging criteria, and specify strict confidentiality and
non-use obligations. The toll contractor also owns the product formula
at all times and controls the sale of the product. The toll manufacturer
simply acts as an extension of the toll contractor in the manufacturing
process, the toll contractor rather than the toll manufacturer should be 
held liable for any breach of implied warranties.
 
In this case, the evidence proves that Goodrich manufactured resin for
Scott Bader pursuant to Bader’s specifications and quality control
standards. . . . After Goodrich manufactured the product, it was
completely out of Goodrich’s control. Bader’s labels were placed on the
resin, and it was eventually sold to Bader’s customers, including
Sandstone. . . . 
 
Where, as here, the toll contractor specifies the product formula,
exercises control over the manufacturing process, and the toll
manufacturer has no contact whatsoever with the purchaser, the
purchaser should not be allowed to pursue breach of implied warranty
claims against the toll manufacturer. The justification for allowing
upstream warranty liability is to ensure that purchasers obtain recourse
for product defects. In the case of tolled products, that recourse is had
by suing the toll contractor. There is no independent act by the toll
manufacturer that should give rise to an additional warranty separate and
apart from any warranty extending from the toll contractor—here,
Bader.

(Footnotes and record citations omitted.)
          Goodrich continues that “the toll manufacturer provides only a service to the
toll contractor, whereas the toll contractor is responsible for the product.” Citing
Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist., 987 S.W.2d 50, 53
(Tex. 1998), Goodrich points out that “Texas law does not recognize an implied
warranty for the performance of services in the absence of a demonstrated compelling
need.” Goodrich contends that “there is no compelling need for an implied warranty
when other adequate remedies are available to the consumer.” See id. 
          Sandstone contends that, even assuming that a legal distinction exists between
a toll manufacturer and a remote manufacturer for purposes of determining implied
warranty liability, evidence was presented showing that Goodrich acted outside of its
roll as a simple “toll manufacturer” and conducted itself more like a “remote
manufacturer.”


 Sandstone points to evidence, including the Boothe memorandum, 
indicating that Goodrich deviated from Scott Bader’s specifications in producing
Texigel. Such evidence supports an inference that Scott Bader did not control
Goodrich’s manufacturing process and indicates that Goodrich acted autonomously
in manufacturing Texigel. Indeed, the allegation that Goodrich (and Para-Chem)
deviated from Scott Bader’s formula in making Texigel is at the heart of Sandstone’s
claims. Accordingly, even if a “true” toll manufacturer falls outside of the holdings
of Nobility Homes and PPG regarding remote manufacturer liability, we conclude
that, on this record, genuine issues of fact exist with respect to whether Goodrich
acted outside its role of toll manufacturer in producing Texigel. With fact issues
present regarding Goodrich’s liability for breach of implied warranty, the trial court
improperly granted judgment as a matter of law in Goodrich’s favor. 
          Although not directly on point, we also find instructive the supreme court’s
decision in Signal Oil & Gas Co. v. Universal Oil Prods., 572 S.W.2d 320, 329–31
(Tex. 1978). There, the supreme court determined whether a party, Procon, could be
sued for breach of implied warranty for assembling an isomax unit and hydrogen
plant” (“the unit”). Id. at 322–23. A defective component part of the unit caused an
explosion, resulting in damage to Signal Oil’s facility. Id. Procon defended against
Signal Oil’s breach of implied warranty claims by arguing it was not a “seller” under
the Business and Commerce Code (“the Code”). Id. at 329–30. Procon maintained
that by assembling the unit it was providing a “service,” which fell outside the scope
of the Code. Id. at 330. 
          In determining this issue, the supreme court looked at the contract between
Procon and Signal Oil, which provided Procon would construct a isomax heater at
Signal Oil’s facility. Id. The court found significant that the contract required Procon
to procure all materials and labor to construct the isomax heater. Id. The contract
also provided for Signal Oil to pay Procon a “purchase price” for the finished
product, not a “construction price.” Id. The supreme court also considered that title
to the isomax heater remained with Procon and did not pass to Signal Oil until the 
heater was completed. Id. 
          The supreme court framed the issue as determining whether an assembler of a
completed product is a “seller” under the Code. The Signal Oil court held that an
assembler of a product is a “seller,” reasoning as follows:
The suitability of the finished product depends as much upon actions of
the assembler as upon actions of the manufacturer of the component
parts. In order for the finished product to be merchantable or fit for its
intended purposes, it must possess suitable component parts, as well as
the proper arrangement, assembly, or combination of such parts.
Consequently, the assembler constitutes an essential link in the chain of
distribution. 
Id. 
          The court also determined that Procon specifically acted as a “seller” under the
Code. The court explained, 
In the instant case the contract between Signal and Procon clearly shows
that Procon acted as a seller. Procon functioned as the assembler of the
component parts into a final completed product, the isomax unit and
hydrogen plant. Procon maintained title in such product until it was sold
to Signal by a bill of sale. Under the contract provisions and
circumstances of the instant case, we hold that Procon was a “seller”
under the provisions of the Texas Business and Commerce Code.
Id. at 331. 
          The reasoning in Signal Oil has potential to assist in determining whether a toll
manufacturer can be liable for breach of an implied warranty. For example, in
determining a toll manufacturer’s liability, it may be useful to know the details of the
contract between the toll manufacturer and the toll contractor. Specifically, which
entity purchases the component parts to make the product, what is the basis for the
contract price—the service or the product—and when does title pass to the product. 
We note that, in this case, such information is not contained in the record. 
          In sum, we conclude that Goodrich was not entitled to judgment as a matter of
law regarding Sandstone’s breach of implied warranty claims. We hold that the trial
court erred by granting Goodrich a take nothing-judgment regarding those claims.



          3.       Liability for DTPA Claim
          We next turn to Sandstone’s DTPA claim against Goodrich. In PPG, the
supreme court explained that a manufacturer cannot be held liable for a DTPA claim
to a “downstream purchaser,” but clarified that a manufacturer which makes
representations or warranties directly to consumers can be held liable under the
DTPA, despite a lack of privity. See PPG, 146 S.W.3d at 89. 
          Here, Sandstone contends that its DTPA claim against Goodrich should be
permitted because Goodrich made misrepresentations to Sandstone by mislabeling the
Texigel. We disagree. In its live pleading, Sandstone’s DTPA claim was premised
on its breach of implied warranties claims, not on representations made by Goodrich
in the Texigel labels. Based on PPG, the trial court properly granted judgment in
favor of Goodrich on Sandstone’s DTPA claims, as stated in Sandstone’s live
pleading. See id.
          We sustain Sandstone’s second issue in part and deny it in part.
Conclusion 
          We reverse the trial court’s judgment with respect to the following sanctions
against Para-Chem: $375,000 in attorney’s fees as sanctions, appellate fees as
sanctions, and $250,000 in sanctions and render judgment that Sandstone take
nothing as to these sanctions. We affirm the portions of the judgment ordering that
Para-Chem is jointly and severally liable for $68,000 in attorney’s fees and expenses. 
We affirm the portion of the judgment granting summary judgment to Para-Chem and
a take-nothing judgment against Sandstone in Para-Chem’s favor. We affirm the
portion of the judgment ordering that Sandstone take nothing against Goodrich with
regard to Sandstone’s DTPA claims. We reverse the portion of the judgment ordering
that Sandstone take nothing against Goodrich based on its claims for breach of
implied warranty of merchantability and for breach of implied warranty of fitness for 

a particular purpose and remand the case to the trial court for further proceedings. 




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Chief Justice Radack and Justices Higley and Wilson.